******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ISAAC KINITY *v.* US BANCORP ET AL.
(AC 44106)

Elgo, Clark and Sheldon, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendants, B Co. and I Co., in connection with certain steps taken by the defendants involving the plaintiff's mortgaged property. B Co. was the servicer of a residential loan to the plaintiff under a note secured by a mortgage on his property. I Co. issued an insurance policy to the plaintiff covering the mortgaged property against loss, as required by the mortgage. After the plaintiff became delinquent on his mortgage payments, an inspection was completed on the mortgaged property. The resulting inspection report noted that the property appeared to be vacant. B Co. advised I Co. of the possible vacancy, and that there might be a change of risk, and also sought assurances from the plaintiff that he either still occupied the property or had procured sufficient insurance to cover it against loss because the current insurance policy did not provide coverage if the property was vacant. Although the plaintiff still occupied the property, B Co.'s receipt of information to the contrary led I Co. to cancel the insurance policy and refund a portion of the premium. Following a conversation with the plaintiff, I Co. reinstated the policy and invoiced the plaintiff for the refunded portion of the premium. When the premium for the reinstated policy was never paid, B Co. procured a more costly lender placed insurance policy at the plaintiff's expense. The plaintiff eventually provided B Co. with evidence that he had obtained his own insurance coverage for the property and the lender placed policy was cancelled. Subsequently, the plaintiff filed an action against a trade name of B Co., and, after that company was defaulted for failure to appear, judgment was rendered in favor of the plaintiff. When B Co. learned of that action, it filed a motion to open and vacate the default judgment. The trial court granted B Co.'s motion and the action was dismissed for lack of subject matter jurisdiction and personal jurisdiction. The plaintiff then commenced the second action against B Co. under the accidental failure of suit statute (§ 52-592) and continuing course of conduct doctrine to recover damages on several theories of liability for injuries and losses, later moving successfully to cite in I Co. B Co. and I Co. then filed separate motions for summary judgment, which the trial court granted on the grounds that none of the plaintiff's untimely claims was saved by the accidental failure of suit statute or the continuing course of conduct doctrine and were barred by the applicable statutes of limitations, and that the plaintiff's remaining claims failed as a matter of law, and the plaintiff appealed to this court. Thereafter, the plaintiff filed an amended appeal from a postjudgment order of the trial court granting I Co.'s motion to enforce a settlement agreement it had reached with the plaintiff. *Held*:

1. The trial court did not err in granting I Co.'s motion to enforce a settlement agreement:

a. The trial court properly exercised its authority under *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.* (225 Conn. 804) (*Audubon*) to enforce the settlement agreement: even though the plaintiff did not raise his unpreserved claim that a trial court lacked authority to summarily enforce a settlement agreement formed postjudgment during the pendency of an appeal, review was appropriate in the exercise of this court's supervisory powers under *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.* (311 Conn. 123), as the record was adequate for review, all parties had an opportunity to be heard on the issue as both parties filed supplemental briefs on this issue, there was no unfair prejudice to any party as I Co. did not assert that it would have presented additional evidence or proceeded differently if the claim had been raised in the trial court, and the party who benefitted from the application of this court's supervisory powers, the plaintiff, could not prevail, thus, review of the claim did not prejudice I Co. and provided the plaintiff with a sense of finality that the plaintiff otherwise

would not have had if this court declined to review the claim; moreover, the trial court was not deprived of its authority to enforce a settlement agreement simply because the action that the agreement settled was on appeal, as a settlement reached by the parties postjudgment and during the pendency of an appeal is a settlement within the framework of the original lawsuit under *Audubon*; furthermore, under *Waldman* v. *Beck* (101 Conn. App. 669), the court had the authority to order the precise form of relief agreed to by the parties, in this case not a judgment in favor of a party, but rather the withdrawal of the action.

b. The trial court properly concluded that a clear, unambiguous, and enforceable agreement had been reached between the plaintiff and I Co. to settle the dispute between them in this action: upon a thorough review of the record, the court's finding concerning the mutual assent of the parties to the terms of the agreement was not clearly erroneous as the plaintiff's attorney never expressly stated to I Co.'s attorney in their e-mail communications that the settlement agreement was contingent upon reaching a global settlement that included B Co., and the fleeting references by the plaintiff's attorney to negotiations with B Co. were not enough to convey to a reasonable person in the position of the attorney for I Co. that the agreement was contingent; moreover, the court did not err in finding that the settlement agreement was supported by valid consideration, as the court found that the terms of the settlement agreement clearly and unambiguously established that I Co. would pay the plaintiff $10,000 in exchange for his release of all claims against it.

c. Because the trial court did not err in granting I Co.'s motion to enforce the settlement agreement, this court did not address the plaintiff's claims concerning the trial court's granting I Co.'s motion for summary judgment.

2. The trial court properly granted B Co.'s motion for summary judgment:

a. The trial court did not err in concluding that § 52-592 was inapplicable and therefore could not save the plaintiff's otherwise untimely claims; the communications between the plaintiff and B Co. and B Co.'s belated appearance in the original action filed by the plaintiff were insufficient to create a genuine issue of material fact that B Co. had actually received the summons and complaint and thereby had actual or effective notice of the original action, as pursuant to *Rocco* v. *Garrison* (268 Conn. 541) and *Dorry* v. *Garden* (313 Conn. 516), an action is commenced within the meaning of § 52-592 when a defendant receives actual or effective notice of the action, within the time period prescribed by law, by way of receipt of the summons and complaint, and the plaintiff failed to provide the court with any evidence that B Co. itself had actual or effective notice of the original action by way of receipt of the summons and complaint as in *Rocco* and *Dorry*, and there was no evidence that service was ever made on B Co.

b. The trial court did not improperly conclude that the continuing course of conduct doctrine was inapplicable to the plaintiff's claims and therefore could not toll the applicable statutes of limitations: there was no genuine issue of material fact regarding whether B Co. owed a continuing duty to the plaintiff as the relationship between the parties was at arm's length and commercial in nature, and there was no special relationship between the plaintiff and B Co. which gave rise to such a continuing duty; moreover, although the court found for the purpose of deciding B Co.'s motion for summary judgment that an implied in fact contract existed between the parties, this court has held that a mere contractual relationship does not create a fiduciary or confidential relationship, as the relationship between B Co. and the plaintiff lacked the unique degree of trust and confidence found in a special or fiduciary relationship; furthermore, B Co., as a servicer of the loan, had a right to further its own interests and therefore was under no duty to represent the interests of the plaintiff.

c. The trial court did not improperly conclude that the plaintiff's claim of breach of the covenant of good faith and fair dealing failed as a matter of law as there was no genuine issue of material fact as to whether B Co. acted in bad faith: because the plaintiff became delinquent on his mortgage payments, B Co. conducted a property inspection of the mortgaged property, the resulting inspection report indicated that the property might be vacant, B Co. then informed I Co. that the property might be vacant and, in its letter to I Co. informing it of such, there was a clear indication of uncertainty as to the occupancy status of the property, B Co. sent numerous letters to the plaintiff stating that it believed the

property to be vacant, it was required to inform I Co. of this belief, and the plaintiff should have contacted I Co. with information regarding the occupancy status of the property, and these actions all indicated that B Co. was not acting in bad faith; moreover, the plaintiff pointed to no evidence supporting his claim that B Co. had acted in bad faith, and his argument that B Co. twice failed to pay the premium on his insurance policy was plainly contradicted by evidence provided by B Co.

Argued January 20—officially released June 7, 2022

*Procedural History*

Action for, inter alia, negligent misrepresentation, and for other relief, brought to the Superior Court in the judicial district of New Haven, where State Automobile Mutual Insurance Company and Patrons Mutual Insurance Company of Connecticut were cited in as party defendants; thereafter, the court, *Wilson, J.*, granted the defendants' motions for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court; subsequently, the court, *Wilson, J.*, granted the motion to enforce a settlement agreement filed by the defendant State Automobile Mutual Insurance Company et al., and the plaintiff filed an amended appeal. *Affirmed.*

*Elio Morgan*, for the appellant (plaintiff).

*Pierre-Yves Kolakowski*, for the appellees (named defendant et al.).

*Deborah Etlinger*, with whom, on the brief, was *Erin Canalia*, for the appellees (defendant State Automobile Mutual Insurance Company et al.).

*Opinion*

SHELDON, J. This case arises from actions taken by the defendants, US Bank NA and US Bancorp,[1] as servicer of a residential loan from People's Bank (lender) to the plaintiff, Isaac Kinity, and his wife, Jane Kinity[2] (borrowers), under a note secured by a mortgage on the borrowers' residential property, and by the defendants, Patrons Mutual Insurance Company of Connecticut and State Automobile Mutual Insurance Company,[3] the insurance company that issued an insurance policy (original policy) to the plaintiff covering the mortgaged property against loss, as required by the mortgage, upon being informed that the property might be vacant. Concerned that the lender's financial interest in maintaining the condition and value of the property might be compromised if the property were vacant, because in that event the plaintiff's original policy might not cover the risk, the bank advised the insurance company of the possible vacancy and sought assurances from the borrowers, either that they still occupied the property or that they had procured sufficient insurance to cover it against loss. Ultimately, although the borrowers still occupied the property, the bank's receipt of information to the contrary led to the cancellation of the original policy, the later reinstatement of the policy, the eventual cancellation of the reinstated policy due to nonpayment of the premium, and the bank's procurement of a more costly lender placed insurance policy (LPI policy) at the plaintiff's expense.

After initially filing an action against a trade name of the bank (original action), which was dismissed for lack of subject matter jurisdiction because a trade name cannot lawfully be sued, and for lack of personal jurisdiction due to insufficient service of process, the plaintiff commenced the present action against the bank under the putative authority of the accidental failure of suit statute, General Statutes § 52-592, and the continuing course of conduct doctrine, to recover damages on several theories of liability for injuries and losses he allegedly sustained as a result of the bank's actions. The plaintiff later moved successfully to cite in the insurance company defendants, and filed a series of amended complaints against both the insurance company defendants and the bank defendants, seeking similar relief against both, on similar theories of liability.[4] The defendants answered the plaintiff's complaint by denying all claims of liability and damages against them and asserting as special defenses that all but one of the plaintiff's claims were barred by the applicable statutes of limitations. In anticipation of the latter special defense, the plaintiff pleaded in his operative complaint that all of his otherwise untimely claims were saved by the accidental failure of suit statute and/or by the continuing course of conduct doctrine.

After the trial court granted the defendants' separate

motions for summary judgment on the grounds that none of the plaintiff's untimely claims was saved by the accidental failure of suit statute or the continuing course of conduct doctrine, and thus that all of them were barred by applicable statutes of limitations, and that his remaining claims failed as a matter of law, the plaintiff appealed to this court. On appeal, the plaintiff claims, inter alia, that the trial court erred in ruling that (1) the accidental failure of suit statute did not save any of his untimely claims because his original action was never "commenced," and thus could not be saved under the authority of that statute, (2) the continuing course of conduct doctrine did not apply to any of his untimely claims because there was no special relationship between himself and any defendant that would impose a continuing duty to him on any defendant, (3) the bank defendants and the insurance company defendants were entitled to judgment as a matter of law on the plaintiff's claims of breach of the covenant of good faith and fair dealing against them, and (4) the insurance company defendants were entitled to judgment as a matter of law on the plaintiff's claim of negligent misrepresentation against them.[5]

Thereafter, while this appeal was pending, the plaintiff filed an amended appeal from a postjudgment order of the trial court granting the insurance company defendants' motion to enforce settlement agreement, claiming that (1) the court had no authority to summarily enforce such an agreement after the case it purported to settle had gone to judgment, and (2) even if it had such authority, it could not exercise that authority in this case because the parties had not entered into a clear, unambiguous, and enforceable settlement agreement. We affirm the judgment of the trial court and its postjudgment order enforcing the settlement agreement.

The following facts and procedural history are relevant to our resolution of this appeal. In October, 2003, the borrowers took out a loan with the lender in the amount of $111,500 to purchase a parcel of real property located at 473-475 Elm Street in New Haven (property).[6] The loan was secured by a mortgage on the property given by the borrowers to the lender. The mortgage note was subsequently endorsed to the Connecticut Housing Finance Authority (CHFA). The bank continued thereafter to service the loan on behalf of CHFA. The mortgage required the borrowers to insure the property against loss and provided that if the borrowers failed to maintain the required coverage, the lender was authorized to obtain insurance coverage at its option and at the borrowers' expense. The mortgage also provided that the borrowers were required to make periodic payments to the lender. These payments included funds to be held in escrow by the bank for payment of the insurance policy premium. In accordance with these requirements, the plaintiff purchased a hazard insur-

ance policy for the property from Norcom Insurance, an agent of the insurance company.[7]

In 2013, the borrowers became delinquent on their mortgage payments. As a result, the borrowers were mailed a letter, dated August 2, 2013, notifying them of the delinquency.[8] The letter also advised the borrowers that property inspections would be completed on all delinquent loans. On October 28, 2013, such a property inspection was completed on the borrowers' mortgaged property. The resulting inspection report noted that the property appeared to be vacant. The following day, on October 29, 2013, the bank mailed the borrowers a letter, notifying them of the inspection report and its consequences as follows: "In accordance with the provision of your Mortgage or Deed of Trust, property inspections are required on all delinquent loans. We recently received a property inspection report which stated that your property is vacant and/or unsecured. Please note that servicing guidelines require that we notify your insurance holder and advise them that your property may be vacant. You should contact your insurance agency and provide them with the current occupancy status of the property."

Thereafter, on October 30, 2013, the bank mailed a letter to the insurance company, advising it that the property might be vacant and, therefore, that there might be a change of risk. The bank also mailed a letter to the borrowers, advising them that it had contacted the insurance company and that the current insurance policy did not provide coverage if the property was vacant. The letter stated: "If we do not receive evidence of acceptable coverage, we will obtain insurance on your behalf. You will be required to bear the cost of this insurance either through an existing escrow account and/or an adjustment in your monthly mortgage payment."

On the basis of the letter it received from the bank, the insurance company issued a notice of cancellation, dated November 6, 2013, in which it informed the plaintiff that the policy would be cancelled, effective December 14, 2013, due to the change in the condition of the risk. On September 18, 2013, the bank disbursed funds to the insurance company in the amount of $1547 for the annual premium on the insurance policy. Because the premium had already been paid, however, the insurance company informed the plaintiff, in the notice of cancellation, that a refund in the amount of $1243 would be issued to him for a portion of the unearned premium. The insurance company issued a check, dated November 12, 2013, for $1243 and mailed it to the plaintiff. The plaintiff asserts that he never received the refund check from the insurance company. The insurance company's records indicate that the check was never cashed.

On November 11, 2013, the insurance company

learned that the property was not in fact vacant when the plaintiff spoke with an agent of the insurance company on the phone and stated that he was still residing at the property. As a result, the insurance company immediately reinstated the insurance policy, and mailed a letter to the plaintiff, notifying him of the reinstatement. No lapse in coverage had occurred between the issuance of the notice of cancellation and the date of reinstatement of the policy, because the cancellation was not to have become effective until December 14, 2013. Because the insurance company had issued a refund to the plaintiff in the amount of $1243, the notice of reinstatement included an invoice for that refunded portion of the premium. The premium for the reinstated policy was never paid. Consequently, on December 19, 2013, the insurance company sent a notice to the plaintiff informing him that the premium for the reinstated policy was past due and that the policy would be cancelled on January 6, 2014, if payment of the premium was not received by that date. Ultimately, because the premium so invoiced was not received by January 6, 2014, the insurance company cancelled the reinstated policy.

On January 8, 2014, the bank received notice of the policy's cancellation from the insurance company and, in turn, informed the borrowers, via a mailed letter, of the cancellation. The letter specified that it was a requirement of the mortgage that homeowners insurance be maintained on the property and requested that the borrowers or their agent send evidence of acceptable coverage or notice of reinstatement of the previous policy. The letter further stated that if the bank did not receive a response from the borrowers or their agent, it would obtain insurance for the property on behalf of the borrowers, and that the borrowers would be required to bear the cost of such insurance. The letter finally advised the borrowers that the bank could not guarantee that the coverage under such a policy would be comparable to that which they had under their previous policy. Two additional letters to the same effect, dated January 13, 2014, and February 17, 2014, respectively, were sent to the borrowers. The bank alleges that it never received a response from the borrowers to any of its letters concerning their obligation under the mortgage to renew or replace the previous policy after it was cancelled.

The bank purchased an LPI policy for the property from Voyager Indemnity Insurance Company, which became effective on January 6, 2014, and remained in effect until January 6, 2015. The annual premium on the LPI policy was $4891.12. In conjunction with its purchase of the LPI policy, the bank issued a letter addressed to the borrowers, dated April 2, 2014, which stated that the bank had purchased insurance for the property and had billed the annual premium for it to the borrowers. The letter strongly recommended that

the borrowers obtain their own insurance coverage for the property, but advised them that until they provided evidence of such coverage, the LPI policy would remain in effect.

On or about December 9, 2014, the borrowers finally provided the bank with evidence that they had obtained their own insurance coverage for the property. As a result, the bank sent a letter to the borrowers, dated December 12, 2014, stating that the LPI policy had been cancelled, effective December 9, 2014, and informing the borrowers that $4514.63 would be charged to their account for the LPI policy premium for the period of time during which the LPI policy was in effect.

On April 1, 2015, the plaintiff filed a summons and complaint in the Superior Court for the judicial district of New Haven, in which he pleaded a single claim of negligent infliction of emotional distress against "US Bank Home Mortgage Company" based on the bank's purchase of the LPI policy.[9] See *Kinity* v. *US Bank Home Mortgage Company*, Superior Court, judicial district of New Haven, Docket No. CV-15-5035395-S (original action). On June 15, 2015, the plaintiff filed a motion for default for failure to appear. The motion was granted by the clerk's office on June 24, 2015. On July 16, 2015, the plaintiff filed an amended complaint pleading additional claims against the same defendant on the basis of the bank's purchase of the LPI policy, sounding in negligent misrepresentation, fraud, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. A hearing in damages was held on September 30, 2015, after which the court rendered judgment in favor of the plaintiff in the amount of $38,759.12 plus taxable costs of $580.99.

On November 7, 2016, the bank filed its first appearance in the action and filed a motion to open and vacate the default judgment, which the court granted. Also on November 7, 2016, the bank filed a motion to dismiss, in which it claimed that the court lacked both subject matter jurisdiction and personal jurisdiction. On February 6, 2017, the court granted the bank's motion to dismiss the original action for lack of subject matter jurisdiction because the named defendant was a mere trade name that lacked the capacity to sue or be sued, and lack of personal jurisdiction for lack of service of process.

On April 18, 2017, the plaintiff filed the present action against the bank defendants. The plaintiff subsequently filed, and the court granted, motions to cite in the insurance company defendants. The operative complaint is the plaintiff's seventh amended complaint, purportedly filed pursuant to § 52-592 and the continuing course of conduct doctrine. The complaint asserts claims sounding in negligent misrepresentation (counts one, eight, nine, and ten), negligent infliction of emotional distress (counts four, seventeen, eighteen, and nineteen), fraud

(counts three, fourteen, fifteen, and sixteen), violations of CUTPA (counts two, eleven, twelve, and thirteen), violations of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq. (counts five and six), and breach of the implied covenant of good faith and fair dealing (counts seven, twenty, twenty-one, and twenty-two).

The bank defendants and the insurance company defendants filed answers and special defenses in which they denied that § 52-592 and the continuing course of conduct doctrine applied to the action. They also asserted, by way of special defenses, that the complaint failed to state claims upon which relief could be granted and that all but one of the claims were barred by the applicable statutes of limitations. The plaintiff then filed replies denying the bank defendants' special defenses.

On February 27, 2019, the insurance company defendants filed a motion for summary judgment. Shortly thereafter, on February 28, 2019, the bank defendants also filed a motion for summary judgment. On March 16, 2020, the court granted both motions for summary judgment, concluding that all of the plaintiff's claims were either time barred or failed as a matter of law. On May 15, 2020, the plaintiff appealed to this court from the court's judgment granting the defendants' motions for summary judgment.

While the plaintiff's appeal was pending before this court, the insurance company, on September 1, 2020, filed a motion in the trial court to enforce a settlement agreement, asserting that it had reached a settlement agreement with the plaintiff on June 29, 2020. The court held an evidentiary hearing on the motion pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 626 A.2d 729 (1993) (*Audubon*). On August 3, 2021, the court granted the insurance company's motion to enforce. The plaintiff then filed an amended appeal on August 16, 2021, in which he challenges the court's postjudgment order granting the insurance company's motion to enforce settlement agreement.

Additional facts and procedural history will be set forth as necessary.

I

We begin by addressing the plaintiff's appeal from the judgment of the trial court granting the insurance company's motion to enforce settlement agreement. The plaintiff claims that the court erred by (1) exercising authority under *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 804, to enforce a settlement agreement, and (2) concluding that a clear, unambiguous, and enforceable agreement had been reached between the plaintiff and the defendant insurance company to settle the dispute between them in this action. We disagree.

The following additional facts are relevant to this claim. Attorney Elio Morgan was retained by the plaintiff to handle the plaintiff's appeal. Attorney Deborah Etlinger represented the insurance company during the proceedings before the trial court and on appeal. Numerous e-mails were exchanged between these appellate counsel that are relevant to our determination of the existence of an enforceable settlement agreement. We begin by setting forth these relevant communications.

On June 3, 2020, Morgan sent an e-mail to Etlinger, seeking to discuss a potential settlement. On June 8, 2020, Etlinger replied, stating that she had been authorized to extend a settlement offer of $10,000 to the plaintiff in exchange for the full and final settlement of all of his claims against the insurance company defendants in this action. In his response e-mail sent the same day, Morgan stated that he would discuss the settlement offer with the plaintiff. Morgan did so, e-mailing the plaintiff later that day to inform him that the insurance company had made him an offer in the amount of $10,000 in exchange for his release of all claims against it in this action. Morgan made clear in his e-mail to the plaintiff that the offer "would not include the bank."

On June 11, Morgan sent a follow-up e-mail to the plaintiff, asking him what he was looking for in this matter. On June 14, 2020, the plaintiff responded that he was seeking Morgan's advice regarding the proposed settlement. Morgan then provided the plaintiff with his phone number and asked the plaintiff to call him the following day. A phone conversation occurred between Morgan and the plaintiff on June 25, 2020. The conversation is memorialized in an e-mail dated the same day. In the e-mail, Morgan advised the plaintiff that pursuing a settlement agreement was in his best interest. He reiterated that the insurance company defendants had offered to settle the plaintiff's claims against them for $10,000. Morgan also noted that the bank defendants had made a settlement offer[10] of $4500 plus a recommendation of loss mitigation[11] in exchange for the plaintiff's release of all claims against them. Morgan notified Etlinger via e-mail that he was still working with his client on the settlement offer but was hopeful that the matter would settle.

Four days later, on June 29, 2020, Morgan again spoke on the phone with the plaintiff regarding the insurance company defendants' settlement offer.[12] After speaking with the plaintiff, Morgan e-mailed Etlinger, stating: "I received the go-ahead from my client. He understands that it will be [$10,000] with no admission and release of all claims. You may send me a release. Thank you." In response, Etlinger thanked Morgan for confirming that the plaintiff had accepted the $10,000 settlement offer and stated that a release would be prepared for Morgan's review.

Etlinger sent the release to Morgan on July 6, 2020. Later that same day, Morgan raised some concerns about the last paragraph of the proposed release, which provided: "Releasor further agrees that he will cause a withdrawal of this action as to the Releasees to be filed in the Connecticut Appellate Court and the Connecticut Superior Court." Specifically, Morgan expressed concern that the release would require the plaintiff to withdraw the Superior Court action, which assertedly would require the opening of the Superior Court judgment. After further discussion, however, counsel agreed that the written terms of the release would remain the same and that the plaintiff would withdraw his appeal and file a copy of the withdrawal with the Superior Court without needing to open the Superior Court judgment. Etlinger then asked Morgan whether any lawyers would be listed as payees on the settlement check from the insurance company. Morgan replied in the negative. The July 6, 2020 e-mail exchange concluded with Etlinger stating that she would tell the insurance company to issue the check to the plaintiff and that she was "look[-ing] forward to receiving the executed [r]elease." Morgan sent the release to the plaintiff via e-mail later that same day.

On July 31, 2020, the plaintiff sent an e-mail to Morgan in which he raised concerns about settling with the insurance company defendants. Specifically, the plaintiff stated that he was apprehensive about how a settlement with those defendants might affect his ability to settle with the bank defendants. The plaintiff stated that he was "of the opinion that there ha[d] to be some signs of hope about the position of the [bank] before signing the [insurance company] settlement, otherwise . . . the [bank] may become difficult in the negotiations after my settlement with the [insurance company]." Morgan responded later in the day, advising the plaintiff that he did not share the plaintiff's concerns because, in his view, there were two different sets of liabilities. Morgan clarified that the plaintiff could continue the appeal against the bank defendants even if he settled with the insurance company defendants. Morgan further advised the plaintiff that his claim against the insurance company defendants was weak, and not the main cause of the plaintiff's problems.

On August 6, 2020, Morgan contacted Etlinger, again via e-mail, stating: "My negotiations with [the bank] [are] taking longer than expected. That puts me under the gun as far as the deadline for [the] brief. I will be filing a motion for extension of time today. I assume you have no reason to object but let me know. My client is in the hospital. If we have to, we'll withdraw the case against your client. Please let me know." Etlinger replied, stating: "We have no objection to your request for an extension to file the brief. We have the settlement check and are prepared to tender it upon our receipt

of the properly executed settlement document by the [p]laintiff. Alternatively do you want to go ahead and withdraw the claims against our clients? I am sorry to hear that [the plaintiff] is in the hospital." Morgan thereafter responded that he would "prefer a global settlement," but if that was not possible he would "go the alternate route." The plaintiff, the next day, filed a motion for extension of time to file his appellate brief, which stated, in relevant part: "In early June, the [plaintiff] decided to pursue settlement with all the parties in lieu of continued litigation. Significant progress has been made. An agreement has been reached with one of the [defendants]. The delay in reaching an agreement with the other [defendant] is due in large part to circumstances beyond the parties' control. The requested time will afford the parties the opportunity to conclude an agreement which will include withdrawal of this appeal." This statement also was included in the plaintiff's motion for leave to permit the filing of a late brief filed on August 21, 2020 with this court.

On August 19, 2020, Morgan met with the plaintiff and the plaintiff's wife to discuss the concerns the plaintiff had raised in his July 31, 2020 e-mail. On August 24, 2020, Morgan e-mailed Etlinger, as follows, regarding his discussions with the plaintiff: "After a period of illness, I finally got to meet with [the plaintiff] on Thursday and fully discussed this and gave him a deadline. Unfortunately, I must inform you that [the plaintiff] called me on Friday to inform me that he will not sign the proposed agreement. He was not able to obtain the global agreement he wants. He has instructed me to move forward with the appeal. Sorry for the inconvenience." Etlinger replied: "As stated in my [e-mail] below, the parties have a binding settlement agreement. We will be filing a [m]otion to [e]nforce the settlement agreement entered into by the parties."

The insurance company filed its motion to enforce settlement agreement on September 1, 2020. The plaintiff filed a memorandum in opposition to the motion. An evidentiary hearing on the motion was held over the course of four days. At the hearing, Morgan testified that the settlement with the insurance company was contingent upon settlement with the bank. Morgan pointed to the statements in his e-mail exchange with Etlinger that referenced a global settlement agreement, arguing that these references evidenced that the agreement was contingent. Morgan, however, conceded that this contingency was never communicated in full to Etlinger. Etlinger testified that her understanding, based upon the e-mail exchanges between her and Morgan, was that the agreement was not contingent. Etlinger testified, "[t]here was absolutely nothing that indicated to me that the settlement that I had reached on behalf of my clients was contingent upon whatever negotiations were happening with [the bank] . . . ."

The court ultimately granted the insurance company's motion to enforce settlement agreement on August 3, 2021. In its memorandum of decision, the court concluded, "based upon a fair preponderance of the evidence, that Attorney Morgan had either actual or apparent authority to enter into the settlement agreement on behalf of the plaintiff with the defendants. The court further conclude[d] that there was a clear, undisputed, and unambiguous agreement entered into by the parties, and that said agreement was not contingent upon the plaintiff reaching an agreement with the codefendant bank." The amended appeal followed.

A

The plaintiff first claims that the court erred by purporting to exercise authority under *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 804, to enforce a settlement agreement. Specifically, the plaintiff claims that a trial court lacks the authority to summarily enforce a settlement agreement formed postjudgment during the pendency of an appeal. Under the plaintiff's view, a trial court only has the authority to summarily enforce a settlement agreement that is reached while the case is pending in the trial court. We disagree.

1

At the outset, the insurance company defendants argue that the issue of whether *Audubon* authorizes the summary enforcement of a settlement agreement reached postjudgment, during the pendency of an appeal, is not properly before us. The insurance company argues, and we agree, that the plaintiff did not raise this issue before the trial court, and thus that the claim is unpreserved. "It is well settled that [o]ur case law and rules of practice generally limit [an appellate] court's review to issues that are distinctly raised at trial. . . . [O]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim— would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. . . . We also have recognized, however, that, although a reviewing court is not *bound* to consider claims that were not raised at trial, it has the authority to do so in its discretion, an authority that is limited neither by statute nor by procedural rules." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 142–43, 84 A.3d 840 (2014) (*Blumberg*).

Our Supreme Court has enumerated the circum-

stances under which a reviewing court may consider unpreserved claims raised by a party: "(1) where the issue involves a question of subject matter jurisdiction; (2) where the issue involves a constitutional violation reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), holding modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015); (3) where the issue is subject to reversal under the plain error doctrine; and (4) where review is appropriate in the exercise of the court's supervisory powers." (Footnote omitted.) *Matos* v. *Ortiz*, 166 Conn. App. 775, 788, 144 A.3d 425 (2016), citing *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 161–64. In *Matos*, this court was faced with the issue of whether *Audubon* extended to the summary enforcement of agreements reached outside the framework of, and before the start of, the relevant litigation. *Matos* v. *Ortiz*, supra, 787. As in *Matos*, the plaintiff here failed to raise the issue before the trial court. See id., 787–88. In those circumstances, this court concluded that "the *Audubon* issue must be reached and decided . . . as an exercise of this court's supervisory powers." Id., 788.

As in *Matos*, we conclude that, in the instant case, review is appropriate in the exercise of this court's supervisory powers. "It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . We recognize that this court's supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the rule invoking our use of supervisory power is one that, as a matter of policy, is relevant to the perceived fairness of the judicial system as a whole, most typically in that it lends itself to the adoption of a procedural rule that will guide lower courts in the administration of justice in all aspects of the [adjudicatory] process. . . . Indeed, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of [this court's] supervisory powers." (Citations omitted; internal quotation marks omitted.) *In re Yasiel R.*, supra, 317 Conn. 789–90.

In *Blumberg*, our Supreme Court laid out a four part test for determining the circumstances under which a reviewing court may consider unpreserved claims raised by a party pursuant to our supervisory powers. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 155–61. "We recently reemphasized the fact that three criteria must be met before we will consider invoking our super-

visory authority. . . . First, the record must be adequate for review. . . . Second, all parties must be afforded an opportunity to be heard on the issue. . . . Third, an unpreserved issue will not be considered where its review would prejudice a party. . . . If these three threshold considerations are satisfied, the reviewing court next considers whether one of the following three circumstances exists: (1) the parties do not object; (2) the party that would benefit from the application of this court's supervisory powers cannot prevail; or (3) a claim of exceptional circumstances is presented that justifies deviation from the general rule that unpreserved claims will not be reviewed." (Citations omitted.) *In re Yasiel R.*, supra, 317 Conn. 790. "[U]nless all parties agree to review of the unpreserved claim or the party raising the claim cannot prevail, the reviewing court should provide specific reasons, based on the exceptional circumstances of the case, to justify a deviation from the general rule that unpreserved claims will not be reviewed." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 160–61.

We conclude that these four requirements are met. First, the record is adequate for review. See id., 155 ("the record must be adequate for review, such that there is no need for additional trial court proceedings or factual findings"). Here, the unpreserved issue is a pure question of law—whether *Audubon* extends to the summary enforcement of a settlement agreement reached postjudgment during the pendency of an appeal. See *Ayantola* v. *Board of Trustees of Technical Colleges*, 116 Conn. App. 531, 538, 976 A.2d 784 (2009) ("a question of law is [a]n issue to be decided by the judge, concerning the application or interpretation of the law" (emphasis omitted; internal quotation marks omitted)); *State* v. *Ledbetter*, 41 Conn. App. 391, 394–95, 676 A.2d 409 (1996) ("to determine whether the record is adequate for review, we must consider the specific claim raised, and whether the record provided is adequate for meaningful review of that claim"), aff'd, 240 Conn. 317, 692 A.2d 713 (1997). Therefore, there would be no need for additional trial court proceedings or factual findings.

Second, all parties have had an opportunity to be heard on the issue. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 156 n. 24 ("[f]undamental fairness dictates that a party must be afforded the opportunity to address an unpreserved claim on appeal"). On October 4, 2021, the parties filed a joint motion with this court seeking permission to file supplemental briefs on the issue of whether the trial court properly determined that a clear, unambiguous, enforceable agreement was reached. This court granted the motion. In his supplemental brief, the plaintiff raised for the first time the issue of whether *Audubon* extends to the summary

enforcement of agreements reached postjudgment during the pendency of an appeal. When the insurance company defendants filed their brief, they likewise addressed this issue. Thereafter, when the case was before the court for oral argument, the issue was fully discussed. Thus, both parties were afforded the opportunity to be heard on the issue.

Third, there is no unfair prejudice to any party. See id., 156–57 ("[p]rejudice may be found . . . when a party demonstrates that it would have presented additional evidence or that it otherwise would have proceeded differently if the claim had been raised at trial"). Here, the insurance company defendants do not assert that they would have presented additional evidence or would have proceeded differently if the claim had been raised in the trial court.

We thus turn to the fourth requirement and conclude that "the party that would benefit from the application of this court's supervisory powers cannot prevail . . . ." *In re Yasiel R.*, supra, 317 Conn. 790; see also *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 311 Conn. 157–58 ("[r]eview of an unpreserved claim may be appropriate . . . when . . . the party who raised the unpreserved claim cannot prevail" (citation omitted; footnote omitted; internal quotation marks omitted)). "Reviewing an unpreserved claim when the party that raised the claim cannot prevail is appropriate because it cannot prejudice the opposing party and such review presumably would provide the party who failed to properly preserve the claim with a sense of finality that the party would not have if the court declined to review the claim." *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, supra, 158 n. 28. As discussed subsequently in this opinion, the plaintiff cannot prevail on his claim that *Audubon* does not extend to the summary enforcement of a settlement agreement reached postjudgment during the pendency of an appeal. Therefore, our review of this claim cannot prejudice the insurance company defendants and will provide the plaintiff with a sense of finality that the plaintiff otherwise would not have if we declined to review this claim.

2

We thus turn to the merits of the plaintiff's claim that the trial court lacked authority pursuant to *Audubon* to summarily enforce a settlement agreement entered into postjudgment while the appeal was pending in this court. Our courts never have addressed whether *Audubon* extends to a settlement agreement reached postjudgment during the pendency of an appeal and thus, this issue presents a question of first impression. Whether *Audubon* applies is a pure question of law to which we apply plenary review. See *Gershon* v. *Back*, 201 Conn. App. 225, 244, 242 A.3d 481 (2020) ("[t]he

plenary standard of review applies to questions of law"), cert. granted, 337 Conn. 901, 252 A.3d 364 (2021); *Matos* v. *Ortiz*, supra, 166 Conn. App. 791 (explaining that whether *Audubon* applies is "a pure question of law").

In *Audubon*, our Supreme Court shaped a procedure by which a trial court could summarily enforce a settlement agreement to settle litigation. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812. The court held that "a trial court may summarily enforce a settlement agreement *within the framework of the original lawsuit* as a matter of law when the parties do not dispute the terms of the agreement." (Emphasis added.) Id.

In coming to this conclusion, the court in *Audubon* relied on federal precedent, specifically that "[a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous. . . . Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. A court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial *or other significant courtroom proceedings*. . . . Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate an additional lawsuit for breach of a settlement agreement. This authority should normally be exercised whenever settlements are announced in the midst of a trial." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 811–12. The court went on to explain the policy reasons behind its decision: "Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to *avoid* a trial." (Emphasis in original.) Id., 812.

This court has cautioned against the use of authority pursuant to *Audubon* outside of the proper context. "The key element with regard to the settlement agreement in *Audubon* . . . [was] that there [was] no factual dispute as to the terms of the accord. Generally, [a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law [only] when the terms of the agreement are clear and unambiguous . . . and when the parties do not dispute the terms of the agreement. . . . The rule of *Audubon* effects a delicate balance between concerns of judicial economy on the one hand and a party's constitutional rights to a jury and to a trial on the other hand. . . . To use the

*Audubon* power outside of its proper context is to deny a party these fundamental rights and would work a manifest injustice." (Citations omitted; internal quotation marks omitted.) *Reiner* v. *Reiner*, 190 Conn. App. 268, 277, 210 A.3d 668 (2019).

The procedure established in *Audubon* has since been expanded. In *Ackerman* v. *Sobol Family Partnership*, *LLP*, 298 Conn. 495, 4 A.3d 288 (2010), our Supreme Court extended *Audubon* to permit the court to resolve issues of fact raised in connection with a motion to enforce a settlement agreement. In *Ackerman*, the court explained that when a party breaches a contract, the nonbreaching party may bring a suit for specific performance of the contract. Id., 533–34. An action for specific performance, the court explained, invokes the equitable powers of the trial court and where the remedy is equitable, there is no right to a jury trial. Id., 533. The court thus concluded that the plaintiffs "had no right to a jury trial on issues raised in connection with enforcement of the settlement agreement. Even if certain factual matters were disputed, the motion to enforce was essentially equitable in nature and, consequently, the court was entitled to use its equitable powers to resolve the dispute without a jury." Id., 534–35.

Thereafter, in *Matos*, this court examined the outer limits of a court's power to summarily enforce a settlement agreement. *Matos* v. *Ortiz*, supra, 166 Conn. App. 796–809. In that case, this court addressed whether *Audubon* applied to agreements reached before and outside the framework of the litigation as to which a settlement agreement was sought to be enforced. Id. The court began its analysis by explaining that "what began in *Audubon* as a summary judgment motion by another name has evolved into an exception to the jury right, allowing the court—rather than the jury—to resolve factual disputes en route to disposing of an action as barred by a release of claims, even in the face of a jury demand." Id., 798. The court noted that "*Audubon* itself—the first case to recognize a right to enforce summarily an agreement to settle litigation— was entirely consistent with the jury's historical function, because it held only that a court could summarily enforce such an agreement as a matter of law and did not hold that the court could decide issues of fact. . . . The procedure used in *Audubon* was identical to that of a motion for summary judgment." (Citation omitted; internal quotation marks omitted.) Id., 800. The court noted, however, that *Ackerman* had "extended *Audubon* to permit the court to resolve not just issues of law, but also issues of fact"; id., 801; and that, "[i]n so holding, the court in *Ackerman* implicitly approved a line of *Audubon* progeny that had empowered trial courts to find facts where necessary to summarily enforce a settlement agreement." Id., 802.

The court in *Matos* held that "for a contract to be an agreement to settle litigation subject to *Audubon* enforcement, it must be reached *after that litigation commenced*." (Emphasis added.) Id., 805. The court explained, "[w]e reach this conclusion because the commencement of an action first invokes the authority of the court, which then acquires its own interest in enforcing any settlement reached. The summary enforcement power recognized in *Audubon* and progeny is grounded in the court's own interest in managing the matters before it. That interest comprises both the court's interest in efficient docket management . . . and the court's interest in the integrity of judicial proceedings . . . . In the majority of cases where settlement agreements have been summarily enforced pursuant to *Audubon*, the agreement at issue was either read directly into the record or otherwise reported to the court. In the cases where a settlement agreement was not directly presented to the court in full, it nevertheless was in some sense placed before the court during pending litigation. . . . We have never extended *Audubon* to agreements that, when made, remained wholly outside the court's domain because no one had yet invoked the court's jurisdiction through service of a summons and complaint. That initial invocation of the court's authority distinguishes an agreement to settle litigation—which may be summarily enforced by *Audubon* motion—from a preemptive release of claims—which may be enforced through a motion for summary judgment or by presentation at trial as a special defense. When an agreement is made to settle a matter pending before the court—i.e., after the litigation has commenced—the swifter remedy of *Audubon* summary enforcement is justified to protect the integrity of the judicial process. We thus conclude that, to qualify as an agreement to settle litigation for purposes of *Audubon*-style summary enforcement, an agreement must be reached after the relevant litigation commenced." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 805–808.

The plaintiff first contends that the trial court was deprived of its authority to render judgment pursuant to *Audubon* because the settlement was reached post-judgment while an appeal was pending. Specifically, the plaintiff contends that, although the agreement was reached after the relevant litigation commenced, as required by *Matos*, the court lacked authority to summarily enforce the settlement agreement pursuant to *Audubon* because the case was no longer pending in the trial court, and thus there was no trial to avoid. We disagree.

In *Audubon*, as previously noted, the court held that "a trial court may summarily enforce a settlement agreement *within the framework of the original lawsuit*" rather than "precipitate an additional lawsuit for breach

of a settlement agreement." (Emphasis added; internal quotation marks omitted.) *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812. The court in *Audubon* also emphasized that the court's authority to enforce a settlement agreement was "especially clear where the settlement is reported to the court during the course of a trial *or other significant courtroom proceedings.*" (Emphasis added; internal quotation marks omitted.) Id., 811. We also note that "courts have summarily enforced releases pursuant to *Audubon* only when they were parts of agreements to end litigation, reached during that litigation. *Audubon* itself referred to [a]greements that *end* lawsuits . . . ." (Emphasis in original; internal quotation marks omitted.) *Matos* v. *Ortiz*, supra, 166 Conn. App. 797. A settlement reached by the parties postjudgment and during the pendency of an appeal is a settlement within the framework of the original lawsuit. In the present case, the parties entered a settlement agreement to end the litigation, and did so in the course of that litigation. An appeal is a significant courtroom proceeding and a settlement agreement reached while an appeal is pending does not only end that proceeding, but in so doing, ends all related future proceedings in the lawsuit, either on remand in the event of a reversal or in ancillary proceedings required to perfect the record on appeal or to make or clarify prior orders or findings in anticipation of appellate review. Thus, we conclude that the court is not deprived of its authority to enforce a settlement agreement simply because the action that the agreement settles is on appeal.

The plaintiff also contends that the court's authority pursuant to *Audubon* and its progeny is limited to the authority to *render judgment* in the original action in accordance with the terms of the settlement agreement. We disagree. The court's authority pursuant to *Audubon* is to "summarily enforce a settlement agreement within the framework of the original lawsuit as a matter of law . . . ." *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812; see also *Vance* v. *Tassmer*, 128 Conn. App. 101, 117, 16 A.3d 782 (2011) (explaining that court's authority pursuant to *Audubon* is "limited to enforcing the undisputed terms of the settlement agreement that are clearly and unambiguously before it" (internal quotation marks omitted)), appeal dismissed, 307 Conn. 635, 59 A.3d 170 (2013); *Waldman* v. *Beck*, 101 Conn. App. 669, 673–74, 922 A.2d 340 (2007) (same).

In *Waldman* v. *Beck*, supra, 101 Conn. App. 671, the plaintiff filed a motion to enforce settlement agreement in which the plaintiff alleged that the parties had reached an agreement to settle the matter, whereby the defendant agreed to pay the plaintiff $20,000 and the plaintiff agreed to discharge the defendant from liability. After the hearing on the motion to enforce, the court rendered a written judgment granting the plaintiff's

motion and entering an award in the amount of $20,000. Id., 672. On appeal, the defendant argued that the terms of the agreement provided that the plaintiff would withdraw the action against the defendant and that no judgment would enter against him. Id., 673. This court concluded that the trial court had "improperly exercised its discretion by rendering sua sponte a judgment that contradicted the terms of the settlement agreement, which the court had the power to enforce." Id., 674. The court explained that "[w]here the terms of an undisputed settlement agreement have been reported on the record during the course of a significant courtroom proceeding, it is especially clear that the court has the authority to enforce a settlement by entry of judgment in the underlying action . . . . Nevertheless, the court's authority in such a circumstance is limited to enforcing the *undisputed terms of the settlement agreement* that are clearly and unambiguously before it, and the court has no discretion to impose terms that conflict with the agreement. . . . [I]n determining the details of relief, the judge may not award whatever relief would have been appropriate after an adjudication on the merits, but *only those precise forms of relief that are either agreed to by the parties . . . or fairly implied by their agreement.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 673–74. The court thus affirmed the court's order granting the plaintiff's motion to enforce settlement agreement but reversed the judgment in favor of the plaintiff. Id., 674.

We therefore disagree with the plaintiff's contention that the only mechanism for enforcing the agreement was to enter judgment in the lawsuit that the parties had thereby agreed to settle. Rather, pursuant to *Waldman*, the court had the authority to order the precise form of relief agreed to by the parties. In this case, as in *Waldman*, the form of relief agreed to by the parties was not a judgment in favor of a party, but rather, the withdrawal of the action.

A number of policy considerations also support our conclusion that *Audubon* applies to a settlement agreement reached postjudgment and during the pendency of an appeal. First, as our Supreme Court explained in *Audubon*, summary enforcement is "essential to the efficient use of judicial resources . . . ." *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 812; see also *Matos* v. *Ortiz*, supra, 166 Conn. App. 806 (explaining that court has interest in "efficient docket management"). In *Audubon*, the court emphasized how this procedure permits a court to summarily enforce a settlement agreement and avoid further litigation rather than resume the matter before it and precipitate an additional lawsuit for breach of a settlement agreement. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 812. Permitting a court to summarily enforce a settlement agreement postjudg-

ment while the matter is on appeal accomplishes these same objectives; further litigation can be avoided. The potential litigation thereby avoided is fourfold: the appeal itself; further ancillary proceedings in the trial court while the appeal remains pending; further proceedings in the trial court should the judgment be reversed and the case be remanded for a new trial or other further proceedings; and an additional lawsuit for breach of the settlement agreement.

This conclusion also preserves the integrity of settlement as a meaningful way to resolve legal disputes, protecting the integrity of the judicial process. See id., 812 ("[s]ummary enforcement . . . preserves the integrity of settlement as a meaningful way to resolve legal disputes"); see also *Matos* v. *Ortiz*, supra, 166 Conn. App. 808 ("[w]hen an agreement is made to settle a matter *pending before the court*—i.e., after the litigation has commenced—the swifter remedy of *Audubon* summary enforcement is justified to protect the integrity of the judicial process" (emphasis in original)). The party seeking enforcement of a settlement agreement should not be deprived of the ability to file a motion to enforce simply because the matter thereby settled is on appeal when the parties reach an agreement.

We therefore conclude that a trial court has the authority pursuant to *Audubon* to summarily enforce a settlement agreement reached by the parties postjudgment, during the pendency of an appeal.

B

The plaintiff also claims that the trial court's decision to grant the insurance company defendants' motion to enforce settlement agreement was clearly erroneous because the evidence does not establish the existence of a final, unambiguous, and binding agreement between them. Specifically, the plaintiff contends that the court's decision was clearly erroneous because (1) there was no meeting of the minds as to the nature of the agreement, and (2) even if there was an agreement, that agreement is unenforceable. We disagree.

As explained in *Audubon*, "[a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous." (Internal quotation marks omitted.) *Hogan* v. *Lagosz*, 124 Conn. App. 602, 613, 6 A.3d 112 (2010), cert. denied, 299 Conn. 923, 11 A.3d 151 (2011). When a party challenges "the trial court's legal conclusion that the agreement was summarily enforceable, we must determine whether that conclusion is legally and logically correct and whether [it finds] support in the facts set out in the memorandum of decision . . . . In addition, to the extent that the [party's] claim implicates the court's factual findings, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly

erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) Id.

1

The plaintiff argues that the evidence does not establish the existence of an enforceable agreement because there was no meeting of the minds as to the nature of the agreement. Specifically, the plaintiff argues that the settlement agreement was contingent upon the plaintiff reaching an agreement with the bank to achieve a global settlement. We disagree.

"Whether a meeting of the minds has occurred is a factual determination." *M.J. Daly & Sons, Inc.* v. *West Haven*, 66 Conn. App. 41, 48, 783 A.2d 1138, cert. denied, 258 Conn. 944, 786 A.2d 430 (2001). We therefore apply the clearly erroneous standard of review. See *Hogan* v. *Lagosz*, supra, 124 Conn. App. 613.

"A settlement agreement is a contract among the parties." (Internal quotation marks omitted.) *Wittman* v. *Intense Movers, Inc.*, 202 Conn. App. 87, 98, 245 A.3d 479, cert. denied, 336 Conn. 918, 245 A.3d 803 (2021). "In order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties. . . . The mutual understanding must manifest itself by a mutual assent between the parties." (Internal quotation marks omitted.) *Platt* v. *Tilcon Connecticut, Inc.*, 196 Conn. App. 564, 577, 230 A.3d 854, cert. denied, 335 Conn. 917, 230 A.3d 643 (2020). In other words, "[i]n order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make. . . . Meeting of the minds is defined as mutual agreement and assent of two parties to contract to substance and terms. It is an agreement reached by the parties to a contract and expressed therein, or as the equivalent of mutual assent or mutual obligation. . . . This definition refers to fundamental misunderstandings between the parties as to what are the essential elements or subjects of the contract. It refers to the terms of the contract, not to the power of one party to execute a contract as the agent of another." (Citations omitted; internal quotation marks omitted.) *Tedesco* v. *Agolli*, 182 Conn. App. 291, 307–308, 189 A.3d 672, cert. denied, 330 Conn. 905, 192 A.3d 427 (2018).

Importantly, however, "[m]utual assent is to be

judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties." (Internal quotation marks omitted.) *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, 167 Conn. App. 36, 45, 145 A.3d 266 (2016); see *Ravenswood Construction, LLC* v. *F.L. Merritt, Inc.*, 105 Conn. App. 7, 12, 936 A.2d 679 (2007) ("[i]n the formation of contracts . . . it was long ago settled that secret, subjective intent is immaterial, so that mutual assent is to be judged only by overt acts and words rather than by the hidden, subjective or secret intention of the parties" (internal quotation marks omitted)); see also *Connecticut Light & Power Co.* v. *Proctor*, 324 Conn. 245, 267–68, 152 A.3d 470 (2016) ("We have recognized, consistent with the objective theory of contracts, that [t]he making of a contract does not depend upon the secret intention of a party but upon the intention manifested by his words or acts, and on these the other party has a right to proceed. . . . Although [t]he phrase meeting of the minds is . . . commonly used by the courts to determine whether there has been mutual assent, it has been described as a misnomer because the minds of the parties to a contract need not, in fact, subjectively meet; rather . . . objective assent is all that is required." (Citations omitted; internal quotation marks omitted.))

Thus, "[i]n construing the agreement . . . the decisive question is the intent of the parties *as expressed*. . . . The intention is to be determined from the language used, the circumstances, the motives of the parties and the purposes which they sought to accomplish. . . . Furthermore, [p]arties are bound to the terms of a contract even though it is not signed if their assent is otherwise indicated." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Wittman* v. *Intense Movers, Inc.*, supra, 202 Conn. App. 98–99.

In its well reasoned memorandum of decision, the court stated that it had "conducted a hearing to determine if the parties had reached a meeting of the minds for settlement. The parties' intent to settle is clearly evidenced in the parties' words, acts, and e-mails setting forth the terms . . . . After [a] settlement inquiry was made by the plaintiff's counsel, an offer was made to the plaintiff to settle his claims against the [insurance company] defendants for $10,000 and the plaintiff through counsel, who had authority to do so, accepted the offer." The court concluded that "[t]he credible evidence [did] not support the plaintiff's claim" that the settlement agreement was contingent upon a settlement with the bank defendants. The court explained that "[n]owhere in the evidence [did] the plaintiff *expressly* state that the settlement was to be contingent upon settlement with the bank. Attorney Morgan's fleeting reference in a few e-mails that he would prefer a global settlement, and that he was in continued negotiations with the bank does not defeat the mutual assent

between the parties that an agreement had been reached for $10,000. . . . The evidence establishes that on June 29, 2020, Attorney Morgan e-mailed Attorney Etlinger, and accepted the settlement offer without any contingencies." (Citation omitted; emphasis in original.)

Upon our thorough review of the record, we cannot conclude that the court's finding concerning the mutual assent of the parties to the terms of the agreement was clearly erroneous. As the trial court aptly described, Morgan never expressly stated to Etlinger in their e-mail communications that the settlement agreement was contingent upon reaching a global settlement that included the bank. Morgan's fleeting references to his negotiations with the bank were not enough to convey to a reasonable person in Etlinger's position that the agreement was contingent. See *Connecticut Light & Power Co.* v. *Proctor*, supra, 324 Conn. 268 (explaining that proper inquiry is what reasonable person would have understood in circumstances). Morgan's subjective intent for the agreement to be contingent upon reaching a settlement with the bank is immaterial to the determination of mutual assent. See *Computer Reporting Service, LLC* v. *Lovejoy & Associates, LLC*, supra, 167 Conn. App. 46–47 ("[t]he existence of a hidden or subjective intent on the part of one party to a contract does not render a finding of mutual assent clearly erroneous"). We therefore conclude that the court did not err in concluding that the parties had a meeting of the minds and a settlement agreement was formed when Morgan e-mailed Etlinger on June 29, 2020, stating: "I received the go-ahead from my client. He understands that it will be [$10,000] with no admission and release of all claims. You may send me a release. Thank you." These overt acts and words establish objective assent to a settlement agreement for $10,000 that was not contingent upon an agreement with the bank.

2

We next turn to the plaintiff's argument that, even if the parties reached a settlement agreement, the agreement is unenforceable because it imposes a condition on the plaintiff that is legally impossible to satisfy or fulfill. We disagree.

As previously noted, the last paragraph of the release provided: "Releasor further agrees that he will cause a withdrawal of this action as to the Releasees to be filed in the Connecticut Appellate Court and the Connecticut Superior Court." The plaintiff essentially argues that this clause renders the agreement unenforceable because "a case cannot be withdrawn after judgment was entered unless the judgment is first opened and the case restored to pending or pleading status." Morgan raised concerns about this clause in the release, namely that the release required the plaintiff to with-

draw the Superior Court action, which assertedly would require the opening of the Superior Court judgment. After further discussion, however, counsel agreed that the written terms of the release would remain the same and that the plaintiff would withdraw his appeal and file a copy of the withdrawal with the Superior Court without needing to open the Superior Court judgment. The plaintiff contends that the requirement that he withdraw the action is a "legal impossibility," and therefore, the agreement is not enforceable and the plaintiff's assent to releasing all claims against the insurance company defendants cannot serve as valid consideration. The plaintiff acknowledges, however, that the parties agreed to " 'live with the language,' " yet contends that this agreement between counsel does not render the settlement agreement enforceable. We are unpersuaded.

"A release is an agreement to give up or discharge a claim. . . . It terminates litigation or a dispute and [is] meant to be a final expression of settlement. . . . A release acts like a contract and, as with any contract, requires consideration, voluntariness and contractual capacity." (Citations omitted; internal quotation marks omitted.) *Viera* v. *Cohen*, 283 Conn. 412, 427–28, 927 A.2d 843 (2007). "The doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. . . . Put another way, [u]nder the law of contract, a promise is generally not enforceable unless it is supported by consideration. . . . [C]onsideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by the promisee . . . . We also note that [t]he doctrine of consideration does not require or imply an equal exchange between the contracting parties. . . . Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (Citations omitted; internal quotation marks omitted.) *Thoma* v. *Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 55–56, 100 A.3d 917 (2014). "Forbearance from suit is, of course, valid consideration for a contract if the claim on which the suit was threatened was valid and enforceable. . . . Moreover, [i]t is a general rule of law that forbearance to prosecute a cause of action, where the right is honestly asserted under the belief that it is substantial, although it may in fact be wholly unfounded, is a valuable consideration which will support a promise." (Citations omitted; internal quotation marks omitted.) *Dick* v. *Dick*, 167 Conn. 210, 225, 355 A.2d 110 (1974).

"Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard. . . . The conclusion drawn from the facts so found, i.e., whether a particular set of facts constitutes consideration in the particular circumstances, is a ques-

tion of law . . . and, accordingly, is subject to plenary review." (Citation omitted; internal quotation marks omitted.) *Thoma* v. *Oxford Performance Materials, Inc.*, supra, 153 Conn. App. 55.

Applying the governing law to the present case, we conclude that the court did not err in finding that the settlement agreement was supported by valid consideration. As discussed previously, the court found that the evidence clearly established that on June 29, 2020, the parties had entered into a settlement agreement—the terms of which clearly and unambiguously established that the insurance company defendants would pay the plaintiff $10,000 in exchange for his release of all claims against them. Per the terms of this agreement, the insurance company defendants would provide consideration in the form of $10,000 while the plaintiff would provide consideration in the form of his promise to release the insurance company defendants from all claims.

Although Morgan raised concerns about the written terms of the release and he and Etlinger discussed those concerns, those discussions did not alter the time at which the parties entered into the agreement. See *Wittman* v. *Intense Movers, Inc.*, supra, 202 Conn. App. 99 ("[T]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement . . . [and we are aware of no authority] that assigns so draconian a consequence to a continuing dialogue between parties that have agreed to work together. We know of no authority that precludes contracting parties from engaging in subsequent negotiations to clarify or to modify the agreement that they had earlier reached. . . . More important . . . [when] the general terms on which the parties indisputably had agreed . . . included all the terms that were essential to an enforceable agreement . . . [u]nder the modern law of contract . . . the parties . . . may reach a binding agreement even if some of the terms of that agreement are still indefinite." (Citation omitted; internal quotation marks omitted.)). Furthermore, the e-mail exchanges between the parties clearly indicate that after the settlement agreement had been reached, Morgan consented to Etlinger's proposal that the written terms of the release would remain the same and that the plaintiff would withdraw his appeal and file a copy of the withdrawal with the Superior Court without opening the Superior Court judgment. As a result, we conclude that the settlement agreement between the parties was enforceable and supported by adequate consideration.

## II

We next turn to the plaintiff's appeal from the judgment of the trial court granting both the bank defendants' and the insurance company defendants' motions for summary judgment. Because we conclude that the

court did not err in granting the insurance company defendants' motion to enforce settlement agreement, we do not address the plaintiff's claims concerning the insurance company defendants, namely, that the insurance company defendants were not entitled to judgment as a matter of law on the plaintiff's claims of negligent infliction of emotional distress and negligent misrepresentation, and that the court erred in determining the date on which the action commenced against the insurance company for purposes of the statute of limitations. As to the bank defendants, the plaintiff claims that the court improperly concluded that (1) § 52-592 was inapplicable in this case, (2) the continuing course of conduct doctrine was inapplicable in this case, and (3) the bank defendants were entitled to judgment as a matter of law on the plaintiff's claims for breach of the covenant of good faith and fair dealing. We disagree.

The record before the court, viewed in the light most favorable to the plaintiff as the nonmoving party, reveals the following relevant facts and procedural history. As previously noted, in the original action, the plaintiff filed a summons and complaint in the Superior Court in the judicial district of New Haven on April 1, 2015, alleging a single claim of negligent infliction of emotional distress against "US Bank Home Mortgage Company" based upon the bank's purchase of the LPI policy. The summons listed the address of "US Bank Home Mortgage Company" as 17500 Rockside Road, Bedford, Ohio, 44146-2099. According to the marshal's return, on February 26, 2015, and again on March 20, 2015, the marshal sent the summons and complaint via U.S. certified mail, return receipt requested, to "US Bank Home Mortgage Company," care of "The Secretary," at 17500 Rockside Road, Bedford, Ohio, 44146-2099. No return receipts were filed in the original action.[13] The case was assigned docket number NNH-CV-15-5035395-S.

On June 15, 2015, the plaintiff filed a motion for default for failure to appear. The motion was granted by the clerk's office on June 24, 2015. On July 16, 2015, the plaintiff filed an amended complaint adding claims of negligent misrepresentation, fraud, and violations of CUTPA. A hearing in damages was held on September 30, 2015, after which the court rendered judgment in favor of the plaintiff in the amount of $38,759.12 plus taxable costs of $580.99.

On November 7, 2016, the bank filed a motion to open and vacate the judgment, which the court granted. Also on November 7, 2016, the bank filed a motion to dismiss, in which it claimed that the court lacked both subject matter jurisdiction and personal jurisdiction. The bank argued that the court lacked subject matter jurisdiction because "US Bank Home Mortgage Company" is a trade name, and therefore a nonexistent entity, which has no independent legal rights to assert

or protect and lacks any capacity to be sued. The bank argued, in the alternative, that even if the court had subject matter jurisdiction over the action, it lacked personal jurisdiction over the bank because the bank had not been served in accordance with Connecticut law.

On February 6, 2017, the court granted the bank's motion to dismiss. The court concluded that it lacked subject matter jurisdiction because "US Bank Home Mortgage Company" is a trade name, not a legal entity. The court also concluded that the plaintiff failed to effect service on the bank, explaining that "[w]hile the court may presume delivery from the attestation that the marshal placed the documents in the U.S. mail, no such presumption can be drawn with regard to the issue of receipt." As a result of the lack of service of process, the court found that it lacked personal jurisdiction over the bank. The plaintiff did not appeal from the judgment of dismissal.

The plaintiff commenced the present action against the bank defendants on March 22, 2017. The operative complaint asserted claims against the bank sounding in negligent misrepresentation, negligent infliction of emotional distress, fraud, violations of CUTPA, and breach of the implied covenant of good faith and fair dealing. The bank asserted special defenses, claiming, inter alia, that all claims, except the good faith and fair dealing claim, were barred by applicable statutes of limitations.

On February 28, 2019, the bank filed a motion for summary judgment, asserting that the plaintiff's CUTPA, fraud, negligent infliction of emotional distress, and negligent misrepresentation claims were all barred by applicable statutes of limitations. As to the plaintiff's claim of breach of the covenant of good faith and fair dealing, the bank argued that the plaintiff could not establish that claim because he had presented no evidence that the bank had acted in bad faith.

The plaintiff filed a memorandum in opposition to the motion for summary judgment, arguing that his claims had been brought in timely fashion under (1) § 52-592, (2) the continuing course of conduct doctrine, and/or (3) the fraudulent concealment statute, General Statutes § 52-595. The plaintiff also contended that the evidence submitted to the court in opposition to the bank defendants' motion raised at least a genuine issue of material fact as to whether the bank had acted in bad faith.

In response, the bank argued that § 52-592 was inapplicable in this case because the original action was never "commenced" within the meaning of the statute, that the continuing course of conduct doctrine was inapplicable because the plaintiff could not establish that the bank owed a continuing duty to the plaintiff

that was related to the alleged original wrong, and that the evidence did not establish fraudulent concealment. Oral argument was held on July 1, 2019.

The court granted the bank's motion for summary judgment on March 16, 2020. The court concluded that there was no genuine issue of material fact that the plaintiff's CUTPA, fraud, negligent infliction of emotional distress, and negligent misrepresentation claims were all barred by applicable statutes of limitations. The court also concluded, under the facts presented on the motion construed in the light most favorable to the plaintiff, that (1) § 52-592 did not save the plaintiff's untimely claims because the original action was never "commenced" for the purposes of the statute, (2) the continuing course of conduct doctrine did not apply to any of the plaintiff's untimely claims because there was no fiduciary relationship between the bank and the plaintiff that would give rise to such a continuing duty on their part toward the plaintiff, and (3) the plaintiff could not establish his claim of fraudulent concealment. The court further found, in relation to the plaintiff's claim of the breach of the covenant of good faith and fair dealing, that "the evidence demonstrate[d] that, on multiple occasions, the [bank] defendants notified the plaintiff of issues that would impact his hazard insurance coverage, and encouraged him to get in contact with the [bank] defendants and/or [the insurance company] to clarify any discrepancies." Therefore, the court concluded, summary judgment was proper on that claim as well. This appeal followed.

We begin our analysis by setting forth the well settled standard of review of a motion for summary judgment. "In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to

establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § [17-45].[14] . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Footnote added; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 10–11, 938 A.2d 576 (2008).

"[I]n the context of a motion for summary judgment based on a statute of limitations special defense, [the defendants] typically [meet their] initial burden of showing the absence of a genuine issue of material fact by demonstrating that the action had commenced outside of the statutory limitation period. . . . When the plaintiff asserts that the limitations period has been tolled by an equitable exception to the statute of limitations, the burden normally shifts to the plaintiff to establish a disputed issue of material fact in avoidance of the statute. . . . Put differently, it is then incumbent upon the party opposing summary judgment to establish a factual predicate from which it can be determined, as a matter of law, that a genuine issue of material fact exists." (Citation omitted; internal quotation marks omitted.) *Iacurci* v. *Sax*, 313 Conn. 786, 799, 99 A.3d 1145 (2014).

"A material fact is a fact which will make a difference in the result of the case. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [Its] function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Internal quotation marks omitted.) *Vestuti* v. *Miller*, 124 Conn. App. 138, 142, 3 A.3d 1046 (2010).

A

The plaintiff argues that, in granting the bank defendants' motion for summary judgment, the court erred in concluding that § 52-592 was inapplicable and therefore could not save the plaintiff's otherwise untimely CUTPA, fraud, negligent infliction of emotional distress, and negligent misrepresentation claims.[15] Specifically, the plaintiff contends that the court's conclusion (1) is based upon an insufficient factual record, and (2) is inconsistent with our Supreme Court's decision in *Rocco* v. *Garrison*, 268 Conn. 541, 848 A.2d 352 (2004). We disagree.

We begin our analysis with an examination of our case law interpreting § 52-592. Section 52-592 (a) provides in relevant part: "If any action, *commenced within the time limited by law*, has failed one or more times to be tried on its merits because of insufficient service or return of the writ due to unavoidable accident or the default or neglect of the officer to whom it was committed, or because the action has been dismissed for want of jurisdiction . . . the plaintiff . . . may

commence a new action . . . for the same cause at any time within one year after the determination of the original action or after the reversal of the judgment." (Emphasis added.) "When a suit has been started seasonably, the statute extends the [s]tatute of [l]imitations for a period of one year after the determination of the original action." (Internal quotation marks omitted.) *Davis* v. *Family Dollar Store*, 78 Conn. App. 235, 240, 826 A.2d 262 (2003), appeal dismissed, 271 Conn. 655, 859 A.2d 25 (2004).

"Deemed a saving statute, § 52-592 enables plaintiffs to bring anew causes of action despite the expiration of the applicable statute of limitations." (Internal quotation marks omitted.) *Estela* v. *Bristol Hospital, Inc.*, 179 Conn. App. 196, 204, 180 A.3d 595 (2018). The statute "is remedial in its character. It was passed to avoid hardships arising from an unbending enforcement of limitation statutes." (Internal quotation marks omitted.) *Rosario* v. *Hasak*, 50 Conn. App. 632, 637, 718 A.2d 505 (1998).

This court has cautioned that, "[a]lthough § 52-592 is remedial in nature, passed to avoid hardships arising from an unbending enforcement of limitation statutes . . . it should not be construed so liberally as to render statutes of limitation[s] virtually meaningless. . . . [B]y its plain language, [§ 52-592] is designed to prevent a miscarriage of justice if the [plaintiff fails] to get a proper day in court due to the various enumerated procedural problems. . . . It was adopted to avoid hardships arising from an unbending enforcement of limitation statutes. . . . Its purpose is to aid the diligent suitor. . . . Its broad and liberal purpose is not to be frittered away by any narrow construction. The important consideration is that by invoking judicial aid, a litigant gives timely notice to his adversary of a present purpose to maintain his rights before the courts." (Citations omitted; internal quotation marks omitted.) *Davis* v. *Family Dollar Store*, supra, 78 Conn. App. 240.

In *Davis*, this court was faced with the question of whether the plaintiff could bring a new action under § 52-592 when the original action was never commenced. Id., 236. The plaintiff in *Davis* attempted to commence an action by delivering a writ of summons and complaint to a sheriff to be served on the defendant. Id. Service, however, was never made on the defendant and the writ of summons and complaint were returned to the plaintiff. Id. The plaintiff then commenced a second action, purportedly pursuant to § 52-592, after the applicable statute of limitations period had expired. Id. The defendant filed a motion for summary judgment, claiming that § 52-592 could not save the plaintiff's untimely action because no service of process was attempted in the original action and, therefore, the original action was never commenced. Id. The trial court granted the defendant's motion for summary judgment,

holding that "there [was] no prior action, commenced or otherwise, upon which a determination has been made. . . . [P]rocess was not served upon the defendant nor returned to the court. . . . [N]o proceeding was commenced prior to the initiation of the instant action. Courts which have considered whether an original action was commenced for purposes of § 52-592 recognize that [there] must be a preceding disposition of a prior action." (Internal quotation marks omitted.) Id., 236–37.

On appeal, this court explained that "[t]he [plaintiff] must satisfy all of the criteria in § 52-592 in order to prevail"; (internal quotation marks omitted) id., 242; and that "[t]he language of § 52-592 requires a plaintiff to have *commenced* an original action before the statute can be applied to save a subsequent action." (Emphasis in original.) Id., 239–40. The court explained that, "[w]ithout the existence of a prior action, the plaintiff cannot invoke the protection of § 52-592. Section 52-592 requires that the initial suit be commenced within the time limited by law. . . . [A]n action is commenced not when the writ is returned but when it is served upon the defendant." (Internal quotation marks omitted.) Id., 240–41. The court concluded that "[b]ecause the writ of summons and complaint were never served on the defendant, the original action did not commence and, therefore, § 52-592 [did] not authorize another action to be filed or to extend any statute of limitations." Id., 241. As a result, the court affirmed the decision of the trial court, reasoning that "[t]he plaintiff, here, has not fulfilled the requirements of § 52-592. The original action was not commenced, resulting in an unseasonable suit. Although the statute is remedial, the language is clear and unambiguous. Section 52-592 (a) provides in relevant part: If any action, commenced within the time limited by law, has failed . . . the plaintiff . . . may commence a new action . . . . Without the commencement of an original action, no action exists for the statute to save." (Emphasis omitted; internal quotation marks omitted.) Id., 242.

The applicability of § 52-592 was further clarified in our Supreme Court's decision in *Rocco* v. *Garrison*, supra, 268 Conn. 541. In *Rocco*, the plaintiffs followed the procedures established by rule (4) (d) (2) of the Federal Rules of Civil Procedure, which permits a plaintiff to request that the defendant waive formal service. Id., 545–46. The plaintiffs sent the summons and complaint to the defendant's home address via certified mail. Id., 546. The plaintiffs received a return receipt from the United States Postal Service indicating that the papers had been delivered to the defendant at her address four days prior to the expiration of the applicable statute of limitations. Id. The defendant, however, did not waive formal service of process and the statute of limitations lapsed before the plaintiff could effectuate formal service of process. Id. The defendant subse-

quently filed a motion for summary judgment, arguing that the plaintiffs had not commenced their action prior to the expiration of the statute of limitations and the court granted the motion. Id. The plaintiffs then commenced a second action pursuant to § 52-592. Id. The defendant, however, moved for summary judgment, alleging that the original action had not been commenced within the meaning of § 52-592 due to lack of proper service, and, thus, that § 52-592 did not apply and could not save the second action from being barred by the statute of limitations. Id., 547. The trial court granted the defendant's motion and the plaintiffs appealed. Id.

On appeal, the defendant argued that "the commencement of an action under Connecticut law occurs when the writ is served upon the defendant, and that an action is not commenced if the defendant is not served *properly*." (Emphasis in original.) Id., 547–48. Our Supreme Court disagreed with the defendant's argument, stating that "[t]he defendant's interpretation of § 52-592 would render a key portion of that statute meaningless. If the savings statute requires effective commencement of the original action, and commencement requires valid service of process, as the defendant argues, then any failure of service of process would require us to conclude that no action had been commenced and that the statute does not apply. This would render superfluous one of the principal purposes of the savings statute, namely, to save those actions that have failed due to insufficient service of process. Moreover, the language of § 52-592 distinguishes between the commencement of an action and insufficient service of process by providing that the action may fail *following* its commencement *because of* insufficient service. To accept the view that improper or insufficient service defeats such an action would undermine the statute's clear and unambiguous meaning and preclude the filing of a second action. We therefore conclude that the term commenced, as used in § 52-592 to describe an initial action that has failed . . . to be tried on its merits because of insufficient service . . . cannot be construed to mean good, complete and sufficient service of process, as the defendant contends." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 550–51.

The court instead agreed with the plaintiffs' contention that their original action was "commenced" in a timely manner for purposes of § 52-592 "when the defendant received clear and unmistakable notice of that action upon delivery of the summons, complaint and related materials pursuant to rule 4 (d) (2)." Id., 547. The court noted that "under the law of our state, an action is commenced not when the writ is returned but when it is served upon the defendant." (Footnote omitted; internal quotation marks omitted.) Id., 549. The court concluded that the original action was " 'commenced' " within the meaning of § 52-592 "when the

defendant received effective notice of that action" within the time period prescribed by the applicable statute of limitations. Id., 551. In so holding, the court stated: "The defendant does not dispute that the plaintiffs' counsel sent her a written request to waive the required service of process. Moreover, the record contains evidence, and the defendant does not dispute, that the plaintiffs' counsel sent by certified mail each of the other items required under rule 4 (d) (2) to effect service of process, including the summons and complaint, two copies of the notice regarding the waiver of formal service and an envelope with sufficient postage for return of the signed waiver. Finally, the record reveals that the plaintiffs' counsel received a return receipt from the United States Postal Service indicating that the items had been delivered to the defendant at her . . . home four days before the two year statute of limitations had expired. A review of the record thus discloses that, although the plaintiffs' counsel did not serve a formal summons upon the defendant within the time period prescribed by the applicable statute of limitations, all of the requirements of rule 4 (d) (2) were satisfied and all of the necessary papers to obtain a waiver of formal service were delivered to the defendant. That the defendant failed to sign and return the waiver does not detract from the fact that the plaintiffs' original action was commenced, for purposes of the savings statute, when the defendant received actual notice of the action within the time period prescribed by the statute of limitations. Thus, in our view, although the original action was not commenced in a timely manner under the applicable statute of limitations due to insufficient service of process, it nevertheless was commenced for purposes of the savings statute.

"By following the procedure set forth in rule 4 (d) (2) to obtain a waiver of formal service from the defendant, the plaintiffs, for all practical purposes, also satisfied the requirements of state law pertaining to formal service of process. In Connecticut, an action is commenced when the writ, summons and complaint have been served upon the defendant. . . . In the present case, the summons, a copy of the complaint and a notice of the action were delivered to the defendant by certified mail four days before the expiration of the statute of limitations. Moreover, the plaintiffs filed the complaint in the [federal] District Court, as required under the federal rules, prior to the issuance of the signed and sealed summons. . . . Accordingly, there is ample support for our conclusion that the original action was commenced in a timely manner within the meaning of the savings statute." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 552–53. The court therefore reversed the trial court's judgment granting the defendant's motion for summary judgment. Id., 559.

Subsequently, in *Dorry* v. *Garden*, 313 Conn. 516,

525, 98 A.3d 55 (2014), our Supreme Court was again tasked with interpreting the language "commenced within the time limited by law" within § 52-592 (a). In *Dorry*, the plaintiff sent a writ, summons and complaint to a marshal by overnight delivery and requested that the defendants be served in hand. Id., 520. The marshal attempted to serve the defendants but rather than serving the defendants in hand, the marshal left copies of the writ, summons and complaint in various professional or hospital offices. Id. The marshal then erroneously indicated on the return that each defendant had been served in hand. Id. The trial court dismissed the claims against the defendants due to improper service. Id. The plaintiff then commenced a second action pursuant to § 52-592. Id. The defendants thereafter filed motions for summary judgment, or in the alternative, dismissal, under the applicable statutes of limitations. Id. The trial court granted the defendants' motions and dismissed the action "on the ground that, although the present action was commenced within one year of the dismissal of the first action, because the defendants were not properly served within the statute of limitations, the trial court was without jurisdiction to hear the case. In doing so, the trial court determined that § 52-592 did not apply to save the plaintiff's action because the first action was not commenced for purposes of that statute." (Footnote omitted; internal quotation marks omitted.) Id., 520–21.

On appeal to our Supreme Court, the plaintiff asserted that "the trial court improperly determined that § 52-592 did not operate to save the present action because it had not commenced within the time limited by law due to improper service. Specifically, the plaintiff claim[ed] that, under *Rocco* . . . the first action was commenced within the time limited by law because each of the defendants had effective notice within the statute of limitations." (Citation omitted; internal quotation marks omitted.) Id., 524. The defendants asserted in response that "the trial court properly determined that § 52-592 did not operate to save the present action because it had not been commenced within the time limited by law . . . . Specifically, the defendants assert[ed] that *Rocco* [did] not apply to the facts of the . . . case." (Internal quotation marks omitted.) Id.

The court noted that in interpreting the language of § 52-592 (a), it was bound by its previous interpretations of the language and the purpose of the statute, namely the court's analysis in *Rocco*. Id., 526. The court in *Dorry* recognized that the court in *Rocco* made clear that " 'commenced within the time limited by law' " could not mean effectuating proper service, and that effective notice to a defendant is sufficient. Id., 529. The court in *Dorry* explained: "[I]n *Rocco*, this court explicitly explained that the plaintiffs' original action was commenced, for purposes of the savings statute, when the defendant received actual notice of the action within

the time period prescribed by the statute of limitations." (Internal quotation marks omitted.) Id., 530.

The court concluded that, as to the first two defendants, the original action was commenced against them because they had effective notice of the action within the time period prescribed by the applicable statute of limitations. Id., 530. The court explained, "it is undisputed that the plaintiff's counsel sent the writ, summons and complaint to a marshal . . . by overnight delivery and requested that the marshal effect in hand service on the defendants. The evidence further demonstrates that, despite indicating on the return of service that she effected in hand service, the marshal actually left copies of the writ, summons and complaint at the business addresses of the defendants. Nevertheless, the plaintiff produced evidence demonstrating that [the first two defendants] became aware of the first action and received a copy of the writ, summons and complaint . . . within the statute of limitations." Id., 529.

The court also concluded that the original action had commenced against the third and fourth defendants. Id., 530–31. The court explained, "[a]s we have previously explained herein, the savings statute allows for an action to be saved if it was commenced within the time limited by law, even if improper service was made within that time, if the defendant had effective notice during that time period." Id., 532. The court concluded that it was clear that these defendants had "received effective notice within the time period limited by law" and therefore that "the trial court improperly determined that the savings statute did not operate to save the plaintiff's second action against those four defendants." Id., 535. Having set forth the law that governs our analysis, we turn to the plaintiff's claims on appeal.

The plaintiff first contends that the court's conclusion that § 52-592 did not apply to save the plaintiff's action is inconsistent with *Rocco*. Specifically, the plaintiff contends that a genuine issue of material fact remains as to whether the bank defendants received actual notice of the original action. We disagree.

As previously noted, "the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . ." (Internal quotation marks omitted.) *Kidder* v. *Read*, 150 Conn. App. 720, 728, 93 A.3d 599 (2014). In support of their motion for summary judgment, the bank defendants relied on the marshal's return of service in the original action. The return, which was attached to the bank defendants' motion for summary judgment, establishes that the summons and complaint were mailed to an address that was not the official address of the bank. The bank defendants also noted in their motion for summary judgment that no evidence of return receipts, confirming the delivery of the summons and complaint to that address, were ever provided to the court. The bank defendants therefore

argued that the plaintiff had not shown that the original action was " 'commenced' " within the meaning of § 52-592.

"Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . The party opposing summary judgment must present a factual predicate for [the party's] argument to raise a genuine issue of fact." (Internal quotation marks omitted.) *Kidder* v. *Read*, supra, 150 Conn. App. 728. In the plaintiff's objection to the bank defendants' motion for summary judgment, the plaintiff asserted that the defendants had actual notice of the original action. We conclude that the plaintiff has failed to present evidence sufficient to show that there was a genuine issue of material fact regarding whether the bank had actual or effective notice of the original action. Specifically, the plaintiff has failed to present evidence that the bank had *actual or effective notice by way of receipt of the summons and complaint* as in *Rocco* and *Dorry*.

In *Rocco*, the defendant did not dispute receiving the summons, complaint, and two copies of the notice regarding the waiver of formal service. *Rocco* v. *Garrison*, supra, 268 Conn. 552. The evidence in the record revealed that the plaintiff had sent the documents via certified mail and had received a return receipt indicating that the items had been delivered to the defendant's home four days prior to the expiration of the applicable statute of limitations. Id. The court concluded that, although the plaintiffs' counsel did not serve a formal summons upon the defendant within the time period prescribed by the applicable statute of limitations, the defendant received actual notice of the action within that time period *by way of receipt of the summons and complaint*, and therefore the action was commenced for purposes of § 52-592. Id. Likewise, in *Dorry*, the plaintiff produced evidence demonstrating that the defendants had become aware of the original action *by way of receipt of a copy of the writ, summons, and complaint. Dorry* v. *Garden*, supra, 313 Conn. 529.

In both *Rocco* and *Dorry*, the court determined that the original action had commenced for purposes of § 52-592 because, even though service of the summons and complaint was defective, the defendants *actually received the summons and complaint*, and thereby got actual or effective notice of the action within the time period prescribed by the applicable statute of limitations. In the present case, by contrast, the plaintiff has presented no evidence that the bank *actually received* the summons and complaint in the original action. The plaintiff nevertheless contends that there is sufficient evidence to create a genuine issue of material fact as

to whether the bank had actual or effective notice of the original action. Specifically, the plaintiff argues that the bank "had actual notice of the [original] action because [counsel for the plaintiff] was contacted by [the bank's] corporate counsel prior to counsel appearing." In the plaintiff's objection to the bank's motion for summary judgment before the trial court, the plaintiff similarly argued that there was a genuine issue of material fact regarding whether the bank had actual notice of the original action because (1) the plaintiff and the bank engaged in communications concerning the original action, and (2) counsel for the bank appeared in the original action. We conclude that neither the communications between the plaintiff and the bank nor the bank's appearance in the original action were sufficient to create a genuine issue of material fact as to whether the bank had actual or effective notice of the original action.

On July 7, 2015, the plaintiff sent a letter to the bank seeking clarification of the events that had transpired with regard to his insurance policy and the amount due on his account. Importantly, this letter did not mention the original action, which the plaintiff had attempted to commence in February and March of 2015, much less did it describe or suggest that the plaintiff had served the bank with copies of the summons or complaint in that action. The bank sent the plaintiff a reply letter on July 24, 2015, detailing the series of events that had occurred with the plaintiff's insurance policy. This letter also failed to mention or to make any reference to any pending lawsuit between the parties or to any pleadings in such a lawsuit. Thus, neither letter was sufficient to raise a genuine issue of material fact as to the bank's receipt of actual or effective notice of the original action by any means, including, critically, by receipt of legal process in that action.

Further communications also took place between the plaintiff and the bank almost one year later in June, 2016. In particular, on June 27, 2016, the bank sent an e-mail to the plaintiff's counsel memorializing a phone conversation that had occurred between the plaintiff's counsel and the bank that morning. The e-mail stated, in part: "As we discussed, I hope that we can find a way to resolve your client's legitimate concerns with his mortgage loan and the default judgment that was entered against U.S. Bank Home Mortgage Company. As I mentioned, we have serious concerns about the validity of the judgment to the service of process and corporate entity issues." As indicated by this e-mail, these communications between the plaintiff and the bank occurred *after* default judgment had already entered in the original action. Default judgment entered in the original action on October 22, 2015, approximately eight months prior to these June, 2016 communications.

On November 7, 2016, the bank filed an appearance in the original action. Like the June, 2016 communications, the appearance was filed after default judgment was entered in the original action. This suggests that the bank first became aware of the original action only by way of the default judgment.[16] Therefore, the June, 2016 communications and the bank's appearance were not sufficient to create a genuine issue of material fact as to whether the bank had actual or effective notice of the original action *by way of receipt of the summons and complaint*, as required by *Rocco* and *Dorry*, as opposed to by way of the default judgment.

In sum, we conclude that the communications between the plaintiff and the bank, and the bank's belated appearance in the original action were insufficient to create a genuine issue of material fact that the bank had actually received the summons and complaint, and thereby got actual or effective notice of the original action.

As previously described, § 52-592 requires that the original action have been commenced. Pursuant to § 52-592, the original action may be commenced by way of insufficient or defective service rather than good, complete, and sufficient service of process. See *Rocco* v. *Garrison*, supra, 268 Conn. 551; see also *Dorry* v. *Garden*, supra, 313 Conn. 529. However, "[a]n action is commenced not when the writ is returned but when it is served upon the defendant." (Internal quotation marks omitted.) *Davis* v. *Family Dollar Store*, supra, 78 Conn. App. 241. In other words, the action is commenced in a timely manner for purposes of § 52-592 "when the defendant *receive*[s] clear and unmistakable notice of that action *upon delivery of the summons, complaint and related materials . . . .*" (Emphasis added.) *Rocco* v. *Garrison*, supra, 268 Conn. 547; see also *Dorry* v. *Garden*, supra, 313 Conn. 530 ("[i]n *Rocco*, this court explicitly explained that the plaintiffs' original action was commenced, for purposes of the savings statute, when the defendant received actual notice of the action within the time period prescribed by the statute of limitations" (internal quotation marks omitted)). Pursuant to our Supreme Court's decisions in *Rocco* and *Dorry*, an action is commenced within the meaning of § 52-592 when a defendant receives actual or effective notice of the action, within the time period prescribed by law, by way of receipt of the summons and complaint.

Here, as previously noted, the original complaint alleged a single claim against "US Bank Home Mortgage Company," a trade name. Furthermore, the summons listed the address of "US Bank Home Mortgage Company" as 17500 Rockside Road, Bedford, Ohio, 44146-2099, which was not the address of the bank's principal place of business. Although the marshal indicated that he sent the summons and complaint via U.S. certified

mail, return receipt requested, to this address, the plaintiff failed to provide the court with any evidence that the bank itself had actual or effective notice of the original action *by way of receipt of the summons and complaint* as in *Rocco* and *Dorry*. The present case is thus akin to *Davis*, where the court was presented with no evidence that service was ever made on the defendant. See *Davis* v. *Family Dollar Store*, supra, 78 Conn. App. 236.[17]

On the basis of the foregoing analysis, we conclude that the plaintiff failed to demonstrate the existence of a genuine issue of material fact as to whether the defendant had actual or effective notice of the original action by way of receipt of the summons and complaint. As a result, the court properly determined that § 52-592 could not operate to save the plaintiff's untimely claims.[18]

B

The plaintiff next argues that the trial court improperly concluded that the continuing course of conduct doctrine is inapplicable to the plaintiff's claims and therefore could not toll the applicable statutes of limitations. Specifically, the plaintiff argues that the court erred in concluding that the bank defendants owed no continuing duty to the plaintiff. We disagree.

"In certain circumstances . . . we have recognized the applicability of the continuing course of conduct doctrine to toll a statute of limitations. Tolling does not enlarge the period in which to sue that is imposed by a statute of limitations, but it operates to suspend or interrupt its running while certain activity takes place. . . . Consistent with that notion, [w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed. . . . [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after the commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [our Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . . Furthermore, [t]he doctrine of continuing course of conduct as used to toll a statute of limitations is better suited to claims where the situation keeps evolving after the act complained of is complete . . . ." (Citation omitted; internal quotation marks omitted.) *Medical Device Solutions, LLC* v. *Aferzon*, 207 Conn. App. 707, 753, 264 A.3d 130, cert. denied, 340 Conn. 911, 264 A.3d 94 (2021).

"The test for determining whether the continuing course of conduct doctrine should apply has developed primarily in negligence cases. For instance, we have recognized the continuing course of conduct doctrine in claims of medical malpractice. . . . In doing so, we noted that [t]he continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied. . . . The continuing course of conduct doctrine has also been applied to other claims of professional negligence in this state. . . .

"In these negligence actions, this court has held that in order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where we have upheld a finding that a duty continued to exist after the cessation of the act or omission relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act. . . .

"Therefore, a precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff. . . . A second requirement for the operation of the continuing course of conduct doctrine is that there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. . . . This court has held this requirement to be satisfied when there was wrongful conduct of a defendant related to the prior act. . . . Such later wrongful conduct may include acts of omission as well as affirmative acts of misconduct . . . .

"In sum, [i]n deciding whether the trial court properly granted the defendant's motion for summary judgment, we must determine if there is a genuine issue of material fact with respect to whether the defendant: (1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." (Citations omitted; internal quotation marks omitted.) *Flannery* v. *Singer Asset Finance Co., LLC*, 312 Conn. 286, 311–13, 94 A.3d 553 (2014). If insufficient evidence has been presented to raise a genuine issue of material fact as to any of those three necessary elements, the availability of the doctrine as a basis for tolling the statute of limitations must be rejected as a matter of law.

The trial court concluded in this case that, "[a]s an initial matter, with regard to the plaintiff's CUTPA

claims, the continuing course of conduct doctrine does not toll the statute of limitations. See *Flannery* v. *Singer Asset Finance Co., LLC*, 128 Conn. App. 507, 514, 17 A.3d 509 (2011), aff'd, 312 Conn. 286, 94 A.3d 553 (2014) ('[A]s to the plaintiff's CUTPA claim, our Supreme Court has stated that the continuing course of conduct doctrine does not toll the three year statute of limitations set forth in General Statutes § 42-110g (f)') . . . ." On appeal, the plaintiff does not challenge the court's conclusion that the continuing course of conduct doctrine could not apply to the plaintiff's CUTPA claims.

As to the plaintiff's claims of fraud, negligent infliction of emotional distress, and negligent misrepresentation, the court concluded that there was no genuine issue of material fact as to whether the bank defendants owed a continuing duty to the plaintiff. The court explained that the relationship between the parties was "at arm's length and commercial in nature." The court went on to explain that "at all relevant times, [the bank] serviced the mortgage on the plaintiff's property. [The bank] was not obligated to represent the plaintiff's interests. . . . [T]he parties' submissions do not contain evidence of a unique degree of trust and confidence between the plaintiff and the defendant akin to a fiduciary or special relationship. . . . As such, there was no fiduciary relationship between the parties that would give rise to a continuing duty on the part of the [bank] defendants. Therefore, the plaintiff has failed to establish that the continuing course of conduct doctrine applies to toll the statute of limitations as to any of the untimely claims." (Citations omitted; footnote omitted; internal quotation marks omitted.)

On appeal, the plaintiff concedes that the bank was not the mortgagee in relation to the plaintiff's mortgage and acknowledges that the bank's sole role was to service the mortgage on behalf of CHFA pursuant to a servicing agreement between the bank and CHFA. See footnote 6 of this opinion. The plaintiff nevertheless suggests that the bank owed a continuing duty to the plaintiff arising from "an implied agreement" between the bank and the plaintiff. According to the plaintiff, "the trial court accepted that an implied agreement exist[ed] between the [bank] and the plaintiff. Under the agreement the [bank] [was] responsible for collecting and holding funds in escrow and to disburse the escrowed funds for payment of hazard insurance premium and tax obligations on behalf of the plaintiff when they [became] due and payable. Each party undertook their respective responsibilities continuously for ten consecutive years. The [bank] breached its duty to the plaintiff when it refused to pay the premium to [the insurance company] to reinstate the hazard insurance policy when payment was requested . . . ." We conclude that there was no special relationship between the plaintiff and the bank which gave rise to such a continuing duty.

"Our appellate courts have not defined precisely what constitutes a special relationship for purposes of tolling because the existence of such a relationship will depend on the circumstances that exist between the parties and the nature of the claim at issue. Usually, such a special relationship is one that is built upon a fiduciary or otherwise confidential foundation. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. . . . The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. . . . Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians. . . . The fact that one [businessperson] trusts another and relies on [that person] to perform [his obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty. . . . [N]ot all business relationships implicate the duty of a fiduciary. . . . In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence. . . . Accordingly, a mere contractual relationship does not create a fiduciary or confidential relationship." (Internal quotation marks omitted.) *Medical Device Solutions, LLC* v. *Aferzon*, supra, 207 Conn. App. 761–62.

Furthermore, "[a]s a general matter, the law does not impose a duty on lenders to use reasonable care in its commercial transactions with borrowers because the relationship between lenders and borrowers is contractual and loan transactions are conducted at arm's length." *Cenatiempo* v. *Bank of America, N.A.*, 333 Conn. 769, 808, 219 A.3d 767 (2019); see also *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 836, 95 A.3d 1063 (2014) ("[g]enerally there exists no fiduciary relationship merely by virtue of a borrower-lender relationship between a bank and its customer" (internal quotation marks omitted)); *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App. 11, 19, 728 A.2d 1114 ("[a] lender has the right to further its own interest in a mortgage transaction and is not under a duty to represent the customer's interest"), cert. denied, 249 Conn. 919, 733 A.2d 229 (1999).

Although the court found, for the purpose of deciding the bank's motion for summary judgment, "that an implied in fact contract existed between the parties," this court has held that "a mere contractual relationship does not create a fiduciary or confidential relationship." (Internal quotation marks omitted.) *Medical Device Solutions, LLC* v. *Aferzon*, supra, 207 Conn. App. 762.

In the present case, the dealings between the bank and the plaintiff did not establish a special or fiduciary relationship between them giving rise to a continuing duty. The relationship between the bank and the plaintiff lacked the unique degree of trust and confidence found in a special or fiduciary relationship. See Id., 761–62. The transactions between the parties were conducted at arm's length. See *Cenatiempo* v. *Bank of America, N.A.*, supra, 333 Conn. 808. Furthermore, the bank, as the servicer of the loan for CHFA, had a right to further its own interests and therefore was under no duty to represent the interests of the plaintiff. See *Southbridge Associates, LLC* v. *Garofalo*, supra, 53 Conn. App. 19.

We therefore conclude that there was no genuine issue of material fact regarding whether the bank owed a continuing duty to the plaintiff, and thus that the court did not err in concluding that the continuing course of conduct doctrine could not apply to toll the statute of limitations as to the plaintiff's otherwise untimely claims.

C

Finally, the plaintiff argues that the trial court improperly concluded that the plaintiff's claim of breach of the covenant of good faith and fair dealing failed as a matter of law. Specifically, the plaintiff contends that a genuine issue of material fact existed as to whether the bank acted in bad faith on the basis of the bank's refusal to pay the premium for the reinstated insurance policy based upon its belief that the home was vacant. We disagree.

In the plaintiff's operative complaint, he alleged that the inspection of the property indicated that the property was in fact occupied, but the bank, nevertheless, sent a letter to the insurance company stating that the property may have been vacant. The plaintiff asserted that these actions were taken in bad faith in order to initiate the cancellation of the plaintiff's insurance policy and permit the bank to replace it with the more expensive LPI policy.

In their motion for summary judgment, the bank defendants argued that they were entitled to summary judgment because the plaintiff could not demonstrate that the bank had acted in bad faith. The bank defendants asserted that they were entitled to order an inspection of the property pursuant to the terms of the mortgage. The bank defendants further asserted that the inspection report did in fact indicate that the property was vacant, and, thus, the bank was required, pursuant to servicing guidelines, to inform the insurance company of this belief. Furthermore, according to the bank defendants, the events that occurred after the bank contacted the insurance company were the result of the plaintiff's failure to respond to its numerous let-

ters.

In the plaintiff's objection to the motion for summary judgment, the plaintiff argued that the bank had acted in bad faith when it failed to pay the premium for the plaintiff's insurance policy in September, 2013, and again in December, 2013. According to the plaintiff, the bank became aware that the property was not vacant on November 21, 2013, yet continued to assert, in bad faith, that the house was vacant.

The court initially noted in its memorandum of decision that "for the purposes of deciding [the] motion, the court will conclude that an implied in fact contract existed between the parties." The court, however, concluded that no evidence was presented that established that the bank had acted in bad faith. The court explained that, contrary to the plaintiff's assertion, the property inspection report listed the status of the property as "partial vacant" and had a note stating " '[v]acant/ [s]ecure/personal property visible/[e]lectric on/[f]or rent posted.' " Furthermore, in the bank's October 29, 2013 letter to the insurance company, the bank stated that it believed that the property was vacant and was therefore notifying the insurance company of a potential change of risk. The court concluded that the letter provided no evidence of bad faith because the letter clearly indicated uncertainty as to the occupancy status of the property. The court also stated that the letters sent by the bank to the borrowers indicated that the bank was not acting in bad faith because the letters stated that (1) the bank believed the property was vacant, (2) the bank was required to inform the insurance company of this belief, and (3) the borrowers should contact the insurance company with information regarding the occupancy status of the property.

As to the plaintiff's argument that the bank failed to pay the premium on his insurance policy in September, 2013, and December, 2013, the court concluded that this argument was plainly contradicted by evidence provided by the bank. On September 18, 2013, the bank disbursed funds to the insurance company in the amount of $1547 for the annual premium on the insurance policy. After that, under the incorrect belief that the property was vacant, the insurance company issued a refund check in the plaintiff's name in the amount of $1243 for the unearned portion of the premium. Upon learning that the property was not in fact vacant, however, the insurance company reinstated the policy. The insurance company then billed the plaintiff $1243 because the insurance company had issued the plaintiff the refund check in that same amount for the unearned portion of the premium. The insurance company's activity list on December 27, 2013, shows that an agent of the insurance company called the bank and asked why the bill in the amount of $1243 had not been paid. The agent noted that the bank claimed that the property

was vacant and required proof that it was occupied. The agent further noted that she had called the plaintiff and advised him to call the bank. The court determined that this evidence did not show bad faith, but rather, supported the bank's position that the property was vacant.

The court also concluded that the plaintiff's own self-serving affidavit, in which he averred that he had called the bank on November 11, 2013 and informed it that the property was not vacant, was insufficient to raise a genuine issue of material fact on that issue.

Finally, the trial court concluded that the plaintiff's assertion that the bank had acted in bad faith was contradicted by the fact that the bank had sent a letter to the plaintiff on January 8, 2014, notifying the plaintiff that the reinstated insurance policy had been cancelled, that insurance was required per the terms of the mortgage, and that the bank would obtain insurance for the property on behalf of the borrowers if proof of acceptable coverage was not provided.

On the basis of the foregoing, the court concluded that the plaintiff had failed to offer any concrete evidence that the bank had acted in bad faith, and thus it granted the bank defendants' motion for summary judgment.

On appeal, the plaintiff argues that the court erred in concluding that there was not a genuine issue of material fact as to whether the bank had acted in bad faith. Specifically, the plaintiff argues that the bank's "refusal to pay the lesser reinstatement premium to [the insurance company] based on its original, refuted, unfounded belief that [the plaintiff's] home was vacant was a deliberate action by [the bank] to create the circumstances where it could purchase a forced placed policy . . . ." (Emphasis omitted; internal quotation marks omitted.) We disagree.

"The relevant legal principles are well established. [I]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . . To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract *must have been taken in bad faith*. . . .

"Bad faith has been defined in our jurisprudence in

various ways. Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose. . . . [B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Landry* v. *Spitz*, 102 Conn. App. 34, 42–43, 925 A.2d 334 (2007). "[B]ad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . . [I]t contemplates a state of mind affirmatively operating with furtive design or ill will." (Internal quotation marks omitted.) *Hutchinson* v. *Farm Family Casualty Ins. Co.*, 273 Conn. 33, 42 n.4, 867 A.2d 1 (2005). "Absent allegations and evidence of a dishonest purpose or sinister motive, a claim for breach of the implied covenant of good faith and fair dealing is legally insufficient." (Internal quotation marks omitted.) *Sidorova* v. *Board of Education*, 158 Conn. App. 872, 892, 122 A.3d 656, cert. denied, 319 Conn. 911, 123 A.3d 436 (2015).

On the basis of our thorough review of the record, we conclude that there was no genuine issue of material fact as to whether the bank defendants acted in bad faith. As the court explained in its thorough and well reasoned memorandum of decision, there was no evidence in the record demonstrating that the bank defendants had acted in bad faith. Paragraph 9 of the mortgage agreement provides that "[i]f . . . [b]orrower fails to perform the covenants and agreements contained in this [s]ecurity [i]nstrument . . . then [l]ender may do and pay for whatever is reasonable or appropriate to protect [l]ender's interest in the [p]roperty and rights under this [s]ecurity [i]nstrument, including protecting and/or assessing the value of the [p]roperty, and securing and/or repairing the [p]roperty." Because the borrowers became delinquent on their mortgage payments, the bank conducted a property inspection of the borrowers' mortgaged property. The resulting inspection report indicated that the property might be vacant by a note stating: "[v]acant/[s]ecure/personal property visible/[e]lectric on/[f]or rent posted." The bank then informed the insurance company that the property "may be vacant." The bank also sent numerous letters to the plaintiff. These letters included (1) a letter dated October 29, 2013, notifying the borrowers that it had informed the insurance company that the property

"may be vacant" and advising him to contact the insurance company on that subject, (2) a letter dated October 30, 2013, advising the borrowers that if it did not receive evidence of acceptable coverage it would obtain other insurance on the borrowers' behalf, (3) a letter dated January 8, 2014, informing the borrowers of the cancellation of the reinstated insurance policy, requesting that they send it evidence of acceptable coverage, and informing them that if such evidence was not received, the bank would obtain other insurance for the property on the borrowers' behalf, (4) a letter dated January 13, 2014, to the same effect as the January 8, 2014 letter, (5) a letter dated February 17, 2014, to the same effect as both the January 8, 2014 and January 13, 2014 letters, and (6) a letter dated April 2, 2014, informing the borrowers that the bank had purchased the LPI policy and billed the borrowers for the annual premium.

Although the plaintiff contends that there was a genuine issue of material fact as to the issue of bad faith, he points to no evidence supporting his claim that the bank had acted in bad faith. As previously noted, "[b]are assertions by the nonmovant are not enough to withstand summary judgment. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Citation omitted; internal quotation marks omitted.) *Macellaio* v. *Newington Police Dept.*, 145 Conn. App. 426, 436–37, 75 A.3d 78 (2013). We conclude that the plaintiff has failed to submit evidence sufficient to raise a genuine issue of material fact as to his claim that the bank acted in bad faith.

The judgment and the postjudgment order enforcing the settlement agreement are affirmed.

In this opinion the other judges concurred.

[1] US Bank NA is a wholly owned subsidiary of US Bancorp. US Bancorp and US Bank NA will be referred to collectively as the bank or the bank defendants in this opinion.

[2] Jane Kinity has never been a party to either the underlying action or this appeal.

[3] State Automobile Mutual Insurance Company is the parent company of Patrons Mutual Insurance Company of Connecticut. State Automobile Mutual Insurance Company and Patrons Mutual Insurance Company of Connecticut will be referred to collectively as the insurance company or the insurance company defendants in this opinion.

[4] The insurance company defendants and the bank defendants are hereinafter, collectively, referred to as the defendants.

[5] The plaintiff also lists, in his appellate brief, as a claim of error, the court's determination of the date this action commenced against the insurance company defendants. Because we conclude that the court did not err in granting the insurance company defendants' motion to enforce settlement agreement, we do not address this claim.

[6] The borrowers also took out a loan with the Connecticut Housing Finance Authority (CHFA) in the amount of $35,000, secured by a mortgage on the property.

[7] The insurance policy was in the plaintiff's name alone. The policy covered the period from October 3, 2013, to October 3, 2014.

[8] The plaintiff maintains that he never received any notice from the bank

regarding the cancellation of his insurance policy and the purchase of the LPI policy. The plaintiff, however, does not specifically deny receiving the bank's letters other than those sent on January 13, 2014, February 17, 2014, and April 2, 2014, which he does specifically deny receiving.

[9] The insurance company was not named as a defendant.

[10] The bank's settlement offer did not involve the insurance company.

[11] Morgan explained that if the plaintiff qualified for loss mitigation, the bank would modify the plaintiff's mortgage terms to include his current balance. In other words, the bank would essentially add the plaintiff's debt to the balance of the mortgage. Morgan emphasized, however, that there was no guarantee the plaintiff would qualify for loss mitigation.

[12] There is no writing memorializing the substance of this phone conversation.

[13] The plaintiff attached to his objection to the bank's motion to open and vacate judgment what purports to be a return receipt, indicating that correspondence was mailed and delivered to "US Bank Home Mortgage Co." on June 28 in Ohio. However, the return receipt was not attached to the return of service filed by the marshal. Furthermore, the return date in the original action was April 7, 2015. "US Bank Home Mortgage Co." is a trade name, not a legal entity. The court in the present action, in its memorandum of decision granting the bank's motion for summary judgment, found that "[n]o return receipts were filed in the original action." On appeal, the plaintiff does not challenge this factual finding by the court, nor does he argue that the return receipt creates a genuine issue of material fact as to whether the bank had actual or effective notice of the original action by way of receipt of the summons and complaint of the original action.

[14] Practice Book § 17-45 (a) provides: "A motion for summary judgment shall be supported by appropriate documents, including but not limited to affidavits, certified transcripts of testimony under oath, disclosures, written admissions and other supporting documents."

[15] It is undisputed that if neither § 52-592 nor the continuing course of conduct doctrine applies, the plaintiff's CUTPA, fraud, negligent infliction of emotional distress, and negligent misrepresentation claims are barred by the applicable statutes of limitation.

[16] There is no evidence in the record indicating how the bank became aware of the default judgment entered against it. The court granted the bank's motion to open and vacate judgment "[b]ased upon the fact that the address at which the defendant received notice of the judgment in this case is different from the address listed in the return of service . . . ."

[17] The plaintiff also contends that the court failed to conduct a factual inquiry into whether the bank had received actual or effective notice of the original action. In so arguing, the plaintiff relies on *Ruddock* v. *Burrowes*, 243 Conn. 569, 576–77, 706 A.2d 967 (1998). *Ruddock*, however, provided that "a plaintiff must be afforded an opportunity to make a factual showing that the prior dismissal was a matter of form in the sense that the plaintiff's noncompliance with a court order occurred in circumstances such as mistake, inadvertence or excusable neglect." (Internal quotation marks omitted.) Id., 577. *Ruddock* requires that, where an action has been terminated by way of a disciplinary dismissal, the court must afford a plaintiff, seeking to bring a second action pursuant to § 52-592, the opportunity to make a factual showing that the disciplinary dismissal was a "matter of form" as required by § 52-592. See id., 576–77.

In the present case, the original action was not terminated by way of a disciplinary dismissal. Here, the plaintiff had the opportunity, in its opposition to the defendants' motion for summary judgment, to present evidence, via affidavits or other supporting documents, to demonstrate the existence of a genuine issue of material fact as to actual or effective notice. If he had presented such evidence, the plaintiff could have defeated the defendants' motions for summary judgment. In the absence of any such evidence, however, the plaintiff failed to meet his burden. The plaintiff's reliance on *Ruddock* is therefore unavailing.

[18] To the extent that the plaintiff argues that General Statutes § 52-593 applies to save his CUTPA, fraud, negligent infliction of emotional distress, and negligent misrepresentation claims, we decline to review this argument because it was not raised before the trial court and therefore is not properly preserved. See *Murphy* v. *EAPWJP, LLC*, 306 Conn. 391, 399, 50 A.3d 316 (2012) ("[i]t is well established that a claim must be distinctly raised at trial to be preserved for appeal").